**UNITED STATES of America,**
**Appellee,**

v.

**Linwood WILKERSON, Defendant–**
**Appellant.**

**Docket No. 03–1177.**

United States Court of Appeals,
Second Circuit.

Argued: Sept. 29, 2003.

Decided: March 18, 2004.

Colleen P. Cassidy, The Legal Aid Society Federal Defender Division, New York, NY, for Defendant–Appellant.

Adam Abensohn, Assistant United States Attorney for the Eastern District of New York, Brooklyn, N.Y. (Susan Corkery and Leonard Lato, Assistant United States Attorneys, of counsel; Roslynn R. Mauskopf, United States Attorney, on the brief), for Appellee.

Before: MINER, CALABRESI and STRAUB, Circuit Judges.

MINER, Circuit Judge.

In the early evening hours of September 8, 1997, Bilberto Lopez and his brother, Natividad, were the victims of a "hold up" while they were moving a stove into the basement of a multi-dwelling residential building that they owned in Brooklyn. Instead of complying with their assailant's demand for money, the Lopez brothers resisted. Consequently, both brothers were shot, and Bilberto died on the basement floor from a gunshot wound. Their assailant fled without recovering the $350 to $400 in cash that Bilberto was carrying on his person.

Qasim Duffy and defendant-appellant Linwood Wilkerson were subsequently tried separately in the United States District Court for the Eastern District of New York (Block, J.) for their respective roles in the hold up: Duffy, for being the hold up man who allegedly attempted to rob the Lopez brothers and for killing Bilberto; and Wilkerson, for his alleged role in (i) planning the hold up, (ii) aiding Duffy's use of the gun during the hold up, (iii) driving the getaway car used in the hold up, and (iv) attempting to intimidate a neighbor who had both overheard an incriminating conversation between Duffy and Wilkerson and taken a photograph of Duffy shortly before the hold up. Duffy was acquitted. Wilkerson was convicted on: (i) one count of conspiring with Duffy to interfere with commerce by robbery, in violation of the Hobbs Act, 18 U.S.C. §§ 1951 & 3551 et seq.; (ii) one count of aiding and abetting Duffy's attempt to interfere with commerce by robbery, in violation of the Hobbs Act, 18 U.S.C. §§ 2, 1951 & 3551 et seq.; (iii) one count of aiding and abetting Duffy in his carrying of a firearm during, and in relation to, a crime of violence that resulted in the death of Bilberto, in violation of 18 U.S.C. §§ 2, 924(c)(1), 924(j)(1), 1111 & 3551 et seq.; (iv) one count of attempted witness tampering, in violation of 18 U.S.C. §§ 2, 1512(b)(2)(A) & 3551 et seq.; and (v) one count of being an accessory after the fact to the conspiracy and the attempt to interfere with commerce by robbery, in violation of 18 U.S.C. §§ 3 &

3551 et seq. Wilkerson was sentenced principally to a prison term of 211 months.

In this appeal, we are called upon to address the following arguments raised by Wilkerson that: (i) the evidence was legally insufficient to support the jury's finding that he aided and abetted Duffy in his carrying of the gun used to kill Bilberto; (ii) the evidence was legally insufficient to support the jury's finding that the attempted robbery/conspiracy, if successful, would have affected interstate commerce, as required by the Hobbs Act; (iii) the District Court erroneously instructed the jury concerning the interstate commerce element of the Hobbs Act; (iv) the District Court abused its discretion in precluding Wilkerson's counsel from eliciting during the cross-examination of two Government witnesses certain inconsistencies between their testimony at Wilkerson's trial and their testimony during Duffy's earlier trial; and (v) the District Court erred in admitting certain testimony from a Government witness over objections from Wilkerson that such testimony constituted improper vouching for another Government witness. For the reasons that follow, we find all of these arguments to be without merit and affirm the judgment of conviction.

## BACKGROUND

Viewing the evidence in the light most favorable to the Government, see *United States v. Mapp*, 170 F.3d 328, 331 (2d Cir.1999), the evidence presented at trial was as follows: The Lopez brothers owned an eight-unit residential building located at 141 Hull Street in Brooklyn, New York. Two of the eight dwellings were occupied by the Lopez brothers and their families, and the remaining six units were rented out to residential tenants. The basement of the building was used exclusively by the Lopez brothers to store materials used in their local landscaping business as well as personal items. In addition to their landscaping business, the Lopez brothers also worked as part-time dishwashers at a TGI Friday's restaurant on the weekends.

Wilkerson was a plumber who lived in an apartment located at 139 Hull Street. The Lopez brothers had hired Wilkerson several times in the past to perform plumbing work at their building and to repair the van that they used in their landscaping business. Two months before the hold up, the Lopez brothers called Wilkerson to come to their building for an emergency repair job to fix a broken pipe. When he did not arrive quickly enough, the Lopez brothers hired another plumber to do the job. When Wilkerson eventually arrived and discovered that another plumber was doing the work, he became very upset and began arguing with the Lopez brothers. To defuse the situation, the Lopez brothers agreed to pay him, and he left.

Shortly before the hold up, Sheri Ligon (who lived at 143 Hull Street) was taking pictures of neighborhood children in front of Wilkerson's building. Running low on film, Ligon walked to the corner store located at the intersection of Rockaway Avenue and Hull Street to purchase more film. On her way to the store, she saw Wilkerson, his wife, and a man who she later identified as Duffy all sitting on the stairs leading up to 147 Hull Street. As she walked passed them, Ligon overheard Wilkerson say to Duffy, "Wait for them to go inside, and go inside and get what you gotta get and come back out." According to Ligon, Wilkerson saw her as she was walking past and, before Duffy could respond, Wilkerson "looked up and [said] shush, be quiet, it's too many ears."

As Ligon returned from purchasing her film, she saw that Wilkerson and Duffy were no longer in front of 147 Hull Street. But, as she began again photographing the neighborhood children, Ligon observed Duffy standing in front of 139 Hull Street talking to some of her neighbors. At that

point, Duffy asked Ligon if she would take his picture so that he could send it to a friend of his who was incarcerated in upstate New York. When she demanded five dollars for the picture and asked Duffy how she could get it to him in light of the fact that they did not know each other, he replied that she should give the picture to Wilkerson the next time she saw him and that Wilkerson would pay her the five dollars. Satisfied with this response, Ligon took Duffy's picture, after he first removed his glasses. (Ligon's picture of Duffy was subsequently admitted as an exhibit at Wilkerson's trial and showed Duffy holding a pair of brown glasses with thick lenses.)

After she took Duffy's picture, Ligon began talking to some of the other neighbors who were standing in front of 139 Hull Street, whereupon Duffy stood up, walked into the building, and proceeded to enter Wilkerson's ground-floor apartment. About five minutes later, Duffy returned wearing a white windbreaker jacket with red, yellow, and blue on the sleeves and the words "Peli Peli" printed on the front of the jacket. Ligon testified that Duffy was "holding on to his left sleeve . . . of his jacket" and that she thought he was holding something inside the left sleeve but could not tell what it was. Ligon then asked Duffy: "What [did] you steal out of those people's house?" He replied: "What me? I didn't steal nothing out of their house." Ligon then asked Duffy: "What [did] you put inside of your jacket?" He then replied: "['N]othing,[']" and, according to Ligon, "started shaking his sleeve down, and it was like hanging. He was holding onto the bottom of the sleeve to keep whatever it was he was putting in the sleeve from falling out." According to Ligon, Duffy then "started . . . lifting up his shirt and opening up the jacket to show [her] that he didn't take anything." She then returned to taking pictures of the children.

At around 6:50 p.m., the Lopez brothers and a twelve-year-old boy named Martin "David" Nunez were moving a stove from the hallway of their building into the basement. When they reached the basement, they closed behind them the door leading to the outside. Shortly thereafter, Natividad heard a knock at the basement door and then a voice from behind the door—a person inquiring about renting one of the apartments in the building. When Natividad opened the door, a man entered the basement, pointed a gun at them, announced that "this [was] a hold up," and demanded that they give him whatever money they had. Instead of complying, the Lopez brothers attempted to wrestle the gun away from their assailant while Nunez ran up the stairs. During the ensuing struggle, each of the brothers was shot, and Bilberto was fatally wounded. The robber then ran out of the building without having taken any money. Natividad testified at trial that the robber was black; was wearing a shirt that was "yellowish, sort of yellow[,] . . . and white trousers"; and wearing brown eyeglasses with thick lenses. The police subsequently recovered a pair of blood-covered, brown glasses from the basement. Natividad could not recall whether his assailant was wearing a jacket and was unable to identify Duffy as the robber. Nunez, however, did identify Duffy as the robber.

A few minutes later, Ligon heard the superintendent of her building yelling at her to get the children out of the street because the superintendent had heard gun shots coming from the basement of the Lopez brothers' building. While she was telling the children to get out of the street and go inside, Ligon looked toward the corner of Hull and Rockaway and saw Duffy running around the corner. Immediately thereafter, she saw Wilkerson get into his brown Cadillac and drive off in the same direction.

The day after the aborted robbery, according to Ligon, Wilkerson confronted her and demanded that she turn over the roll of film that had Duffy's picture on it. Unbeknownst to Wilkerson, Ligon had already turned the film over to the police; but she told him that she had destroyed the film. Ligon testified that Wilkerson responded: "You know if you give up that film to anybody, some shit's going to happen to you and your family." On the same day that he visited Ligon, Wilkerson also paid a visit to the local police precinct, where he introduced himself as Troy Thomas and told a police detective that Ligon may have taken a picture of the robber sought by the police. On September 11, 1997, Wilkerson telephoned the precinct, identified himself by his first name, and told another detective that he believed someone named "Anthony," who also went by the name "Qasim" and who lived in Brownsville, had killed Bilberto. The next day, Wilkerson called the precinct again, identified himself using his first and last name, and stated that "Anthony Flowers," a.k.a. "Qasim," lived in Manhattan, wore glasses, and had previously been incarcerated. The police contacted the New York State parole authorities and determined that "Anthony Flowers" was an alias for Duffy.

A few days later, Wilkerson told a third detective that the person who shot the Lopez brothers was "Anthony Kason," who used to live in the vicinity of Riverdale and Saratoga and who was now living in Harlem. According to the testimony of the detective who spoke with Wilkerson, Wilkerson stated that Kason was a violent person who had a history of committing robberies and that he had once killed someone in a dispute over a car.

In late January/early February of 2001, Wilkerson and Duffy were indicted and arraigned for the hold up of the Lopez brothers. The Government later stipulated to a severance, and the two were tried separately in early 2002. While Wilkerson was incarcerated pending trial, he befriended Richard Toney, a federally-sentenced prisoner who taught Bible studies at the prison chapel. Toney testified that Wilkerson asked him for legal advice concerning the latter's upcoming trial and subsequently made several incriminating statements to Toney when he asked Wilkerson to tell him about the facts of Wilkerson's case. In particular, Wilkerson admitted to Toney that Wilkerson had threatened Ligon and her daughter in an attempt to retrieve the roll of film containing Duffy's photograph. When Toney asked Wilkerson if the latter had been involved in the robbery, Wilkerson responded: "[W]e did [it,] me and Duffy did it, but I can't be placed in the basement, they can't place me inside the basement. I didn't actually pull the trigger but they can't place me inside the basement." According to Toney, Wilkerson then told him that "Duffy [had run] out of the basement, run down the street, around the block" and that Wilkerson had gone "around the block, picked Duffy up, [and taken] Duffy somewhere."

Wilkerson's judgment of conviction and sentence was entered on March 18, 2003, and this timely appeal followed.[1]

## DISCUSSION

I. *Sufficiency of the Evidence Supporting Aiding and Abetting Duffy's Use of the Gun*

The standard under which we review a challenge to the sufficiency of the evidence in a criminal trial is a familiar one:

---

1. We note with displeasure the fact that the notice of appeal was not included in the Joint Appendix, as required by 2d Cir. R. 30(d).

A defendant challenging a conviction based on a claim of insufficiency of the evidence bears a heavy burden. *See United States v. Walsh,* 194 F.3d 37, 51 (2d Cir.1999). The evidence presented at trial should be viewed "in the light most favorable to the [G]overnment, crediting every inference that the jury might have drawn in favor of the [G]overnment." *United States v. Walker,* 191 F.3d 326, 333 (2d Cir.1999) (quotation marks omitted) .... We consider the evidence presented at trial "in its totality, not in isolation," but "may not substitute our own determinations of credibility or relative weight of the evidence for that of the jury." *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000). "We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998). Accordingly, we will not disturb a conviction on grounds of legal insufficiency of the evidence at trial if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also United States v. Naiman,* 211 F.3d 40, 46 (2d Cir.2000).

*United States v. Dhinsa,* 243 F.3d 635, 648–49 (2d Cir.2001). With this deferential standard of review in mind, we turn to Wilkerson's argument that the evidence presented to the jury was legally insufficient to support the jury's finding that he aided and abetted Duffy's use of the gun.

■ A defendant's guilt as an aider and abettor must be established separately with respect to a firearms offense and not merely with respect to the underlying robbery. *United States v. Medina,* 32 F.3d 40, 45 (2d Cir.1994). Moreover, a defendant "cannot be convicted as an aider and abettor under [18 U.S.C.] § 924(c) merely because he knew that a firearm would be used or carried and, with that knowledge, performed an act to facilitate or encourage the robbery itself." *Id.* For example, in *Medina,* we reversed the defendant's firearms conviction where the evidence established that he knew that one of the robbers would be carrying a gun but did not establish that he acted in any way to facilitate or encourage the use of a gun; mere knowledge that a gun would be used was legally insufficient to prove aiding and abetting its use. *Id.* In contrast, we held that the evidence in *United States v. Persico,* 164 F.3d 796, 802–03 (2d Cir.1999), was legally sufficient to establish aiding and abetting where one of the coconspirators testified that the defendant had instructed him to provide a silencer to the murderers.

■ Here, Wilkerson did not use a firearm and was not present when the firearm was used to kill Bilberto. In arguing that the evidence was legally insufficient, Wilkerson focuses our attention on the conversation Ligon testified she had overheard between Wilkerson and Duffy: "Wait for them to go inside, and go inside and get what you gotta get and come back out." While the Government argues that this statement was a direction to Duffy to retrieve a gun from Wilkerson's apartment, Wilkerson counters that this statement—which did not mention a gun—was made to direct Duffy to "go inside" the Lopez brothers' basement to commit the robbery. These two competing views of this statement may therefore be contrasted as follows:

*Government's View:* "Wait for them [the Lopez brothers] to go inside [their basement], and go inside [my apartment] and get what you gotta get [the gun] and come back out."

*Wilkerson's View:* "Wait for them [the Lopez brothers] to go inside [their base-

ment], and go inside [their basement] and get what you gotta get [their money] and come back out."

Without any additional evidence, either reading of this statement is plausible, and the statement would not be legally sufficient proof that Wilkerson aided and abetted Duffy's § 924(c) violation. *See United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (evidence that gives " 'nearly equal circumstantial support' to competing explanations for [the victim's] death ... fail[s] to establish [the defendant's] guilt beyond a reasonable doubt"). But Ligon's trial testimony was *not* the sole piece of evidence against Wilkerson on the § 924(c) charge.

During its redirect examination of Ligon, the Government requested permission to introduce, as prior consistent statements, part of a taped interview of Ligon conducted by a police detective and three Kings County Assistant District Attorneys the day after the attempted robbery. At a sidebar, in response to Judge Block's inquiry about what was on the tape, counsel for the Government stated: "The portion I'm playing is on September 9 of 1997. Ms. Ligon was passing 147 Hull Street and heard [Wilkerson] say to Duffy, [']Go get your thing and when you see those people, go back into the basement. Go do what you have to do.['] Just like she said just now." Judge Block permitted the Govern-

ment to play that portion of the tape, and (subsequent to oral argument in this appeal) the parties submitted to us for review (i) that tape and (ii) an unofficial transcript of the tape, made by Wilkerson's trial counsel. According to the tape and transcript,[2] Ligon stated that, as she walked to the corner store to purchase a role of film, she passed Wilkerson, his wife, and Duffy; "they were discussing something[,] ... [Ligon] was listening to what they said[,] and [Wilkerson] told [Duffy ...] [']when you go inside[,'] he said[,]['']get what you have to get and come back out and wait for two guys to go in the basement and then[,'] he said[,] ... [']go do what you have to do.[']''

■ Taken together with Ligon's testimony about Duffy's subsequent conduct, this characterization by Ligon of Wilkerson's statement, recorded only a day after she overheard it, thus makes Wilkerson's interpretation of Ligon's trial testimony significantly less plausible than the Government's interpretation.[3] In addition to Ligon's testimony, Toney testified that Wilkerson admitted that he was concerned about Ligon's testimony because, as she was "walking by [Wilkerson], his wife[,] and Duffy sitting down on the stoop," Ligon overheard Wilkerson "tell Duffy to go inside, get what he had to get, to follow the guys inside the basement to rob them, some guys staying next door to him or

---

**2.** We have reviewed the tape and find that it matches the transcript.

**3.** We note that Ligon's taped statement was properly admitted for its truth because (i) it was a prior consistent statement, (ii) Ligon was subject to cross-examination regarding its substance, (iii) it was introduced by the Government to rebut defense counsel's implication that Ligon's testimony about the events surrounding the robbery had changed in light of some recent assistance that she had received from the Government in securing public housing, and (iv) the taped statement was recorded at least three years before the devel-

opment of this alleged motive to fabricate. *See* Fed.R.Evid. 801(d)(1)(B) ("A statement is not hearsay if ... [t]he declarant testifies at the trial ... and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's *testimony and is offered to rebut an express or implied charge* against the declarant of recent fabrication or improper influence or motive."); *see also United States v. Forrester*, 60 F.3d 52, 64 (2d Cir.1995) ("The statement must have been made before the declarant developed the alleged motive to fabricate.") (citing *Tome v. United States*, 513 U.S. 150, 156, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995)).

something." Toney further testified that Wilkerson told Toney that "Ligon had seen this guy Duffy go in his house and change clothes into ... a red and yellow jacket, a red and blue jacket, [or] something like that." Finally, as discussed above, Ligon testified that, shortly after overhearing the conversation between Wilkerson and Duffy, she observed Duffy enter Wilkerson's apartment and return wearing a jacket in which she believed him to be concealing an object.

Consequently, the jury's finding that Wilkerson aided and abetted Duffy's use of the gun was not entirely based on Ligon's trial testimony about the conversation between Duffy and Wilkerson, but also likely rested on her prior tape-recorded statement, Toney's testimony, and Ligon's testimony as to what she saw Duffy do after the Wilkerson/Duffy conversation that Ligon overheard. Admittedly, the above evidence is circumstantial because Ligon did not know "what [Duffy] had to get" or if he was hiding a gun in his jacket sleeve. But we have repeatedly emphasized that a jury may base its verdict "entirely on circumstantial evidence" and that "it is the task of the jury, not the court, to choose among competing inferences." *E.g., United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir.1995). Accordingly, we find that the Government provided sufficient evidence for a rational juror to have "found the essential elements of [the § 924(c) count] beyond a reasonable doubt." *See Glenn*, 312 F.3d at 63.

## II. Interstate Commerce Element of the Hobbs Act Counts

Wilkerson next argues that the evidence supporting his Hobbs Act conviction was legally insufficient in that it did not satisfy the interstate commerce element of the Act, and that Judge Block erroneously instructed the jury concerning the evidence required to satisfy the interstate commerce element of the Act. We address these two arguments seriatim.

### A. Sufficiency of the Evidence

■■■ The Hobbs Act proscribes, inter alia, robberies, attempted robberies, and conspiracies to commit robberies that "in any way or degree obstruct[ ], delay[ ], or affect[ ]" interstate commerce. 18 U.S.C. § 1951(a), (b)(3). "In a Hobbs Act prosecution, proof that 'commerce [wa]s affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference.' " *United States v. Elias*, 285 F.3d 183, 188 (2d Cir.) (quoting *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)), *cert. denied*, 537 U.S. 988, 123 S.Ct. 430, 154 L.Ed.2d 356 (2002). Indeed, "[t]here is nothing more crucial, yet so strikingly obvious, as the need to prove the jurisdictional element of a crime." *United States v. Leslie*, 103 F.3d 1093, 1103 (2d Cir.1997). This "jurisdictional nexus transforms the quintessential state crimes of robbery and extortion into federal crimes." *United States v. Perrotta*, 313 F.3d 33, 37 (2d Cir.2002). Nevertheless, "it is well established that the burden of proving a nexus to interstate commerce is minimal." *Elias*, 285 F.3d at 188. Indeed, "[t]he jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce. Even a potential or subtle effect will suffice." *United States v. Angelilli*, 660 F.2d 23, 35 (2d Cir.1981) (citation omitted).[4]

Before turning to the evidence supporting Wilkerson's Hobbs Act conviction and

---

4. *See also United States v. Fabian*, 312 F.3d 550, 554 (2d Cir.2002) ("Our precedent requires the [G]overnment make only a *de minimis* showing to establish the necessary nexus for Hobbs Act jurisdiction."), *cert. denied*, 538 U.S. 1025, 123 S.Ct. 1958, 155 L.Ed.2d 871 (2003); *United States v. Jamison*, 299 F.3d 114, 118 (2d Cir.2002) ("We have long recognized that the requirement of showing an

our examination of whether that evidence was legally sufficient, we provide a brief summary of our recent Hobbs Act jurisprudence in which the legal sufficiency of the evidence was challenged. We do so because all of these cases were decided after Wilkerson was convicted, and the outcomes of these cases (and the reasoning supporting those outcomes) explain our conclusion that Wilkerson's Hobbs Act conviction must be affirmed, notwithstanding the exceedingly thin evidence concerning the interstate commerce element.

In *United States v. Elias*, 285 F.3d 183, the defendant was convicted of robbing $1400 in cash, along with cigarettes, subway MetroCards, telephone calling cards, and food stamps from a neighborhood grocery store in Queens. The evidence that this robbery affected interstate commerce was that the grocery story sold beer that had been brewed in Mexico and the Dominican Republic and fruit that had been grown in Florida and California. In affirming the defendant's conviction, we rejected the argument that the Government was required to show that some of the products sold at the grocery store were purchased directly from out-of-state suppliers. Specifically, we held that "a robbery of a local distribution or retail enterprise may be said to affect interstate commerce if the robbery impairs the ability of the local enterprise to acquire— whether from out-of-state or in-state suppliers—goods originating out-of-state." *Id.* at 189. The rationale for our holding was that the grocery store

> furnished an outlet for goods that move[d] in interstate commerce, and the robbery impaired its financial capacity

effect on commerce involves only a minimal burden of proving a connection to interstate commerce, and is satisfied by conduct that affects commerce in any way or degree." (internal quotation marks and citations omitted)), *cert. denied*, 537 U.S. 1196, 123 S.Ct. 1258, 154 L.Ed.2d 1033 (2003).

to draw goods from interstate origins for local resale. Since the evidence at trial established that the [grocery store] stocked goods originating out-of-state, the requisite indirect, minimal effect on interstate commerce was thereby sufficiently established.

*Id.*

In *United States v. Jamison*, 299 F.3d 114, a divided panel of our court affirmed a Hobbs Act conviction arising out of the attempted murder and robbery of a businessman at his home. The victim was "a part owner of an incorporated retail business . . ., which sold clothing, shoes, [pagers], cell phones, CDs, and tapes," and a trafficker in cocaine. *Id.* at 115–16. The attempted robbery occurred shortly after the victim had returned home from purchasing $15,000 worth of merchandise for his business, carrying approximately $3300 in unspent cash from his shopping trip. *Id.* at 116. In addition to the cash he was carrying with him when he returned home, the victim also had stored approximately $18,000 in cash in a safe in his house.

The defendant showed up at the victim's house with a gun, demanding to know "[w]here[ ] the money" was. *Id.* At the defendant's trial, the Government sought to satisfy the interstate commerce element of the Hobbs Act by demonstrating the effect that the robbery would have had on the victim's clothing and narcotics businesses. "The [G]overnment's theory was that [the defendant's] attempted robbery, if successful, would have depleted cash that [the victim had] regularly used to purchase items in interstate commerce as inventory for his clothing and cocaine businesses." *Id.* at 116–17.[5] On appeal, the

5. The Government established that the items in the victim's clothing inventory were manufactured, inter alia, outside the United States

defendant argued that "the evidence did not allow the inference that [the victim had] intended to use the money in his possession to purchase goods in interstate commerce," and that "where the robbery victim is a private individual, rather than a business, the robbery is less likely to affect commerce, and the [G]overnment must therefore show a 'substantial' effect, rather than a minimal effect," on interstate commerce. *Id.* at 118.

We rejected the first argument and declined to reach the second. In particular, in concluding that the victim had "commingled the moneys coming to him from all sources to be used for all purposes," we relied on his testimony that he had "intended to use the approximately $21,000 he had in cash ... for 'drugs or clothing, whatever.'" *Id.* at 119. With respect to the defendant's argument that the victim's use of the word "whatever" indicated that the victim had intended to use the money for personal expenses, we found that the victim's testimony (when viewed in the light most favorable to the Government) established that "he [had] used [the money] primarily to purchase business inventory for both businesses." *Id.* Thus, "[t]he jury could draw the inference that, had [the] robbery attempt succeeded in depriving [the victim] of the $21,000 ... he had on hand at his house, this would have substantially diminished his inventory purchases of clothing manufactured [out of state], and cocaine originating [out of state]." *Id.* Furthermore, because we concluded that "[r]obbing [this particular victim] in his home was no different in its effect on commerce from robbing a place of business," *id.* at 120 n. 2, we declined to

reach the defendant's argument that a stricter standard should apply for satisfying the interstate commerce element in Hobbs Act prosecutions arising out of the robbery of an individual as opposed to a business. *Id.* at 119 n. 2 & 119–21.

In *United States v. Fabian*, 312 F.3d 550, another divided panel of our court affirmed a Hobbs Act conviction arising out of the robbery of (and conspiracy to rob) two separate victims, one of whom was a retired taxi cab driver. The defendant, believing that the retired taxi driver was a loan shark, broke into the victim's house and stole several thousand dollars and some jewelry. In affirming the defendant's conviction, we rejected the argument that the interstate commerce element was not met because the retired taxi driver was not, in fact, a loan shark involved in interstate commerce. "What [was] legally relevant [was] whether at the time of the crime, [the defendant] *believed* he was robbing a loan shark ..., not whether the crimes *actually* involved a loan shark." *Id.* at 555 (emphasis added).

On the same day that we affirmed the Hobbs Act conviction in *Fabian*, we reversed the Hobbs Act conviction in *United States v. Perrotta*, 313 F.3d 33, where the "only connection to interstate commerce [was] that the victim work[ed] for a company engaged in interstate commerce." *Id.* Such a "link between the crime and interstate commerce," we held, was "simply too attenuated to support federal Hobbs Act jurisdiction." *Id.* at 36. In reaching this conclusion, we "join[ed] our sister circuits in drawing a distinction between the extortion of an individual and the extortion of a business for the purposes of establishing Hobbs Act jurisdiction." *Id.*[6] To permit

and that the cocaine sold by the victim originated outside of New York. 299 F.3d at 117.

6. *See United States v. Lynch*, 282 F.3d 1049, 1053 (9th Cir.2002) ("the taking of small sums of money from an individual has its primary and direct impact only on that indi-

vidual and not on the national economy"); *United States v. Nghia Le*, 256 F.3d 1229, 1234–36 (11th Cir.2001), *cert. denied*, 534 U.S. 1145, 122 S.Ct. 1103, 151 L.Ed.2d 999 (2002); *United States v. Min Nan Wang*, 222 F.3d 234, 239 (6th Cir.2000) ("a small sum stolen from a private individual does not,

the defendant's Hobbs Act conviction to stand, we concluded, "would expand the reach of the Hobbs Act to include every robbery or extortion committed." *Id.* at 37. Finally, we identified circumstances in which the interstate commerce element of the Hobbs Act would be satisfied when the target of the defendant was an individual instead of a business: (i) where the victim directly participated in interstate commerce; (ii) where the defendant targeted the victim "because of her status as an employee at a company participating in interstate commerce"; (iii) where the assets of a company engaged in interstate commerce were, or would have been, depleted as a result of the harm or potential harm, respectively, to the individual victim; or (iv) where the defendant targeted the assets of a business engaged in interstate commerce rather than an individual. *Id.* at 37–38. But we also held that "[m]erely showing employment with a company that [did] business in interstate commerce, without more, stretch[ed] the Hobbs Act too far." *Id.* at 38.

Finally, in *United States v. Silverio*, 335 F.3d 183 (2d Cir.2003) (per curiam), we affirmed the Hobbs Act conviction of a defendant who attempted to rob a doctor in his apartment, in the belief that the doctor kept a substantial amount of cash from his medical practice there. Specifically, we held that the evidence demonstrated an "interstate nexus because [the doctor] was a direct participant in interstate commerce through his business of treating a worldwide celebrity clientele, because the robbery would have depleted the assets of [the doctor's] business, and because the robbery targeted the assets of his business rather than his personal property." *Id.* at 187. We explained that "in the absence of an actual effect on interstate commerce, a defendant's belief about the nature of his crime may be determinative. But when ... ample effects on interstate commerce [have been] demonstrated, the state of mind of the defendant is not relevant." *Id.*

■ With the above precedents in mind, we turn to the evidence introduced by the Government to support the interstate commerce element of Wilkerson's Hobbs Act conviction. At the time of the hold up, the Lopez brothers had been operating their landscaping business for about five years. According to Natividad, the landscaping business was an "informal" business, i.e., it was not incorporated; there was no separate bank account for the business; the business' phone number was the home phone number of one of the Lopez brothers; the income from the business was not

---

through aggregation, affect interstate commerce merely because the individual happens to be an employee of a national company"); *United States v. Quigley*, 53 F.3d 909, 910 (8th Cir.1995) (no jurisdiction where robbery victims were two individuals who were en route to a liquor store to make a purchase); *United States v. Collins*, 40 F.3d 95, 100 (5th Cir. 1994) (no jurisdiction found where defendant robbed a computer company executive of his car and his cell phone, even though the robbery might have prevented the victim from attending business meetings or making business phone calls) ("Criminal acts directed toward individuals may violate [§ ] 1951(a) only if: (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) if the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) if the number of individuals victimized or the sum at stake is so large that there will be some 'cumulative effect on interstate commerce'" (footnotes omitted)); *United States v. Buffey*, 899 F.2d 1402, 1406 (4th Cir.1990) ("Extorting money to be devoted to personal use from an individual does not affect interstate commerce."); *United States v. Mattson*, 671 F.2d 1020, 1025 (7th Cir.1982) (drawing a nexus by linking an employee with a corporation's ability to purchase goods in interstate commerce "is too indirect").

reported to the Internal Revenue Service; and no written records were kept for the business. The services performed by the business were clipping trees and mowing and fertilizing lawns for residential, in-state customers. The demands of the business varied with the changing of the seasons, but during the summer, the Lopez brothers worked nine-to-ten hours a day, six days a week.

The Lopez brothers purchased the supplies used in their landscaping business from two local retail stores: Home Depot and Cale Brothers. The Lopez brothers typically purchased their supplies every week or two, typically on Mondays. Natividad testified that items shown in photographs of the basement taken shortly after the hold up were supplies that had been purchased for the landscaping business that were being stored in the basement.[7] These items included clippers, fertilizer, landscaping bags, peat moss, and a lawnmower. A Home Depot employee (who for nine years had managed the garden department in the Brooklyn Home Depot store in which he worked) testified that several of the landscaping supplies contained in the photographs of the basement were carried by his store and other Home Depot stores, although he could not confirm that the items in the photographs had, in fact, been purchased from Home Depot. The Home Depot employee further testified that most of the supplies featured in the photographs of the basement had originated outside New York. For example, the peat moss came from Canada; the lawnmower, from Minnesota; the lawnmower oil, from North Carolina; the fertilizer, from Ohio; and the lime, from somewhere in the southwestern United States.

Natividad also testified about the $350 to $400 Bilberto was carrying when he was killed. Although the hold up occurred on a Monday evening, the Lopez brothers had not yet purchased landscaping supplies for the week. According to Natividad, they were "putting the money in the bank and cashing the checks . . . in order to be able to make some payments that [they] had to make." Natividad further testified that they had intended to use this money to "buy the equipment that [they] used in gardening" and to pay for other, family-related expenses. There is no evidence in the record to indicate the source of the money Bilberto was carrying (e.g., the landscaping business, rental income from their building, salary from TGI Friday's, etc.). Finally, Toney testified that Wilkerson had given him a number of reasons for robbing the Lopez brothers:

> [Wilkerson] . . . knew these guys because they owned a landscaping company or lawn service or something, that he had worked with these guys before but he did not like the guy that had got killed, they [were] having confrontations as far as money or something but he didn't like the guy that had gotten killed and he knew they always kept money inside this establishment, large amounts of money.

In light of the Hobbs Act cases described above, the totality of this evidence, when viewed in the light most favorable to the Government, establishes a sufficient nexus between the charged offenses and interstate commerce to satisfy the interstate commerce element of the Hobbs Act, albeit barely. Specifically, this evidence would permit a rational juror to infer that: (i) Wilkerson conspired (and aided and abetted an attempt) to rob the assets of the Lopez brothers' landscaping business; (ii) the landscaping business, although it serviced only in-state customers, purchased supplies from an in-state retailer, which had purchased those same supplies

---

7. These photographs were admitted as exhibits at Wilkerson's trial.

from out-of-state wholesalers; and (iii) if the attempted robbery had been successful, it would have depleted assets from the landscaping business that would have been used to buy supplies that traveled in interstate commerce. Under the Hobbs Act precedents discussed above, this evidence was legally sufficient to support Wilkerson's conviction.

■ Admittedly, several factual anomalies converged to make this a somewhat unusual case. First, the Lopez brothers' landscaping business was not a traditional, incorporated business, such as the grocery store in *Elias*. But we have affirmed Hobbs Act convictions where the victims' businesses did not comply with all of the formalities observed in the legitimate business world and, indeed, even where the victims engaged in the buying and selling of contraband. *See, e.g., Fabian*, 312 F.3d 550 (drug trafficking by one victim and alleged loansharking by the other victim); *Jamison*, 299 F.3d 114 (cocaine trafficking); *cf. United States v. Jones*, 30 F.3d 276 (2d Cir.1994) (robbery victim was an undercover narcotics officer whose depleted assets were to be used to purchase narcotics). Second, the robbery took place at an individual's residence instead of at his place of business, in contrast to the robbery in *Elias*. But as we observed in *Jamison, Fabian*, and *Silverio*, the fact that a robbery takes place at a residence does not transform the robbery from the robbery of a business into the random robbery of an individual (as was the case in *Perrotta*), so long as the evidence supports the conclusion that the robbery targeted the assets of a business. Third, the amount of money found on the victim was only a few hundred dollars. Given that Wilkerson was charged with the inchoate offenses of conspiracy and attempted robbery, however, the relevant inquiry is not how much money was at the crime scene (or indeed whether there was any money at the crime scene at all), but rather how

much money Wilkerson intended to steal and what effect the theft of that amount of money would have had on interstate commerce. *See Silverio*, 335 F.3d at 187.

On appeal, Wilkerson argues that there was insufficient evidence to satisfy the interstate element of the Hobbs Act, because "[t]he [G]overnment offered no evidence as to the source of [the] money; [i.e.,] whether it was from [the Lopez brothers'] dishwashing job, from rent, from lawn mowing, or from all of these sources." Given the evidence discussed above, however, this is a red herring. That some or all of the money Bilberto was carrying may have come from a source other than the landscaping business is of no moment, given that a rational juror could have inferred that Wilkerson had targeted the assets of the Lopez brothers' landscaping business and that at least some of the money Bilberto was carrying at the time of the hold up would have been used to purchase out-of-state supplies for that business. *See Jamison*, 299 F.3d at 119–21.

Wilkerson also argues that there was insufficient proof that the money Bilberto was carrying would have been used to purchase *out-of-state* gardening supplies. Specifically, Wilkerson points to the facts that the Lopez brothers purchased their supplies from both Home Depot and Cale Brothers and that no evidence was introduced concerning the origins of the landscaping materials sold at Cale Brothers. Nevertheless, the testimony from the Home Depot employee established not only that the supplies depicted in the photographs taken of the basement had been shipped to Home Depot from out-of-state suppliers, but also that several of these items (e.g., lime) could have been purchased *only* from an out-of-state supplier, as there were no local suppliers of these products in New York. Consequently, a rational juror could have inferred that the

targeted funds would have been used to purchase landscaping supplies that could have come only from out of state.

Finally, Wilkerson argues that the evidence failed to establish that the Lopez brothers were "targeted" because of their landscaping business. In support of this argument, Wilkerson relies on the fact that, in Toney's testimony, he testified in separate sentences that (i) Wilkerson knew that the Lopez brothers owned a landscaping business, and (ii) Wilkerson knew that they always kept large sums of money inside their house. While Toney's testimony (like Ligon's) was not a model of grammatical clarity, a rational juror could have inferred from his testimony that Wilkerson had planned to rob the Lopez brothers at their home because he believed they kept large sums of money from their landscaping business there.

██ In affirming Wilkerson's Hobbs Act conviction based on the evidence that was presented to the jury, we are mindful that we stand on the metaphorical slippery slope, dangerously close to "expand[ing] the reach of the Hobbs Act to include nearly every robbery ... committed." *Perrotta*, 313 F.3d at 37. Indeed, were we the first panel to rule on this type of sufficiency-of-the-evidence challenge, we might well reach a different conclusion. But we are not the first panel to address this issue and are bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court. *See*

*BankBoston, N.A. v. Sokolowski (In re Sokolowski)*, 205 F.3d 532, 534–35 (2d Cir. 2000) (per curiam); *see e.g.*, *United States v. Rybicki*, 354 F.3d 124 (2d Cir.2003) (en banc) (overruling in part, *United States v. Handakas*, 286 F.3d 92, 104–07 (2d Cir. 2002)).[8] Accordingly, we find that the Government provided sufficient evidence for a rational juror to have "found the essential elements of [the § 1951 count] beyond a reasonable doubt." *See Glenn*, 312 F.3d at 63.

### B. *Jury Instruction*

██ Wilkerson next argues that he is entitled to a new trial because Judge Block's instruction to the jury concerning the interstate commerce element of the Hobbs Act was erroneous. "The propriety of a jury instruction is a question of law that we review *de novo*." *United States v. George*, 266 F.3d 52, 58 (2d Cir.2001). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Walsh*, 194 F.3d 37, 52 (2d Cir.1999) (internal quotation marks omitted). Moreover, a defendant who requests an instruction "bears the burden of showing that the requested instruction accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." *United States v. Abelis*, 146 F.3d 73, 82 (2d Cir.1998) (internal quotation marks omitted). For the reasons set forth below, we

8. Indeed, as noted above, the Supreme Court has consistently declined to grant certiorari in similar cases in which the sufficiency of the evidence supporting the interstate commerce element of the Hobbs Act has been affirmed. *See, e.g., Fabian*, 538 U.S. 1025, 123 S.Ct. 1958, 155 L.Ed.2d 871; *Jamison*, 537 U.S. 1196, 123 S.Ct. 1258, 154 L.Ed.2d 1033; *Elias*, 537 U.S. 988, 123 S.Ct. 430, 154 L.Ed.2d 356. Moreover, the refusal of the Supreme Court to grant certiorari in these cases is

significant, given its recent willingness to curtail the Government's ability to prosecute essentially local crimes under federal statutes requiring a sufficient nexus between interstate commerce and the charged offense. *See, e.g., Jones v. United States*, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (declining to find federal jurisdiction under the federal arson statute, 18 U.S.C. § 844(*i*), for prosecution of defendant who burned down a private residence).

find that Wilkerson has not overcome this burden.

■ Wilkerson's trial counsel requested that Judge Block deliver the following jury instruction concerning the interstate commerce element of the Hobbs Act:

> [T]he [G]overnment must [p]rove beyond a reasonable doubt ... that the attempted robbery, if proved, had an actual or potential effect on interstate commerce. You may find an effect on interstate commerce if and only if the actions have depleted, or potentially depleted the assets of an individual who is directly and customarily engaged in interstate commerce.

Judge Block denied the request and instructed the jury as follows:

> [Y]ou must ... determine whether there was an actual or potential effect on commerce between any two or more states or foreign countries.
>
> If you decide that there was any effect at all on interstate or foreign commerce, then that is enough to satisfy this element. Now, the effect can be minimal. For example, if a successful robbery of money would prevent the use of those funds to purchase articles which travel through interstate or foreign commerce, that would be a sufficient effect on commerce.
>
> If you decide that interstate or foreign commerce would potentially or possibly be affected if [Wilkerson] had successfully and fully completed his actions, then the element of affecting commerce is satisfied. You do not have to find that interstate or foreign commerce was actually affected.
>
> You do not have to decide whether the effect on interstate or foreign commerce was harmful or beneficial to a particular business, or to commerce in general. The Government satisfies its burden of proving an effect on interstate or foreign commerce if it proves beyond a reason-

able doubt any effect ..., whether it was harmful or not.

> Now, Mr. Duffy [Wilkerson's coconspirator] need not have intended or anticipated an effect on interstate or foreign commerce. You may find the effect is a natural consequence of his actions. If you find that Mr. Duffy intended to take certain actions ... and ... those actions have either caused, or probably would cause, an effect on interstate or foreign commerce, then you may find the requirement of this element have been satisfied.

On appeal, Wilkerson argues that Judge Block's jury instruction was flawed because it made "no distinction whatsoever between a business and an individual. The charge did not require the jury to make any finding that a business was robbed, or that the robbery, if successful, would have depleted the assets of a business." According to Wilkerson, the jury was erroneously instructed that "it could find the [interstate commerce] element proven if it found that the Lopez brothers[, as opposed to their business,] would have used part of their cash to buy goods that had once traveled in interstate commerce." We find Wilkerson's argument unpersuasive.

Even if (prior to our decision in *Perrotta*) Judge Block should have instructed the jury that the "robbery of an individual depleting the individual's personal funds should be governed by a different test from a robbery that depletes the assets of a business, it would not affect the present case." *Jamison*, 299 F.3d at 121. Here, as discussed above, a rational juror could have inferred that the attempted robbery, if successful, would have taken the cash that would have been used by a business to purchase supplies that traveled across state lines, even if (as in *Jamison*) the cash was commingled with the Lopez brothers' personal assets. Indeed, as we explained

in *Perrotta*, when the target of an attempted robbery is an individual, the interstate commerce element of the Hobbs Act is satisfied where the defendant targets the assets of a business, rather than an individual's personal assets, and where those assets would have been used to purchase supplies that traveled in interstate commerce. *See* 313 F.3d at 38. Accordingly, we reject Wilkerson's argument that he is entitled to new trial based on an erroneous jury instruction.[9]

### III. *Limitations on Cross Examination*

 Wilkerson also argues that he is entitled to a new trial because Judge Block improperly limited defense counsel's cross examination of Natividad and Ligon by not permitting counsel to elicit inconsistencies between their testimony at his trial and their testimony at Duffy's earlier trial. A district court is "accorded broad discretion in controlling the scope and extent of cross-examination," *Fabian*, 312 F.3d at 558 (internal quotation marks omitted), and "the decision to restrict cross-examination will not be reversed absent an abuse of discretion," *United States v. Lawes*, 292 F.3d 123, 131 (2d Cir.2002) (internal quotation marks omitted). Moreover, while an attorney may, of course, seek to impeach a witness by eliciting that he or she testified differently regarding a material matter at a prior trial, it is well within the discretion of the trial judge to disallow any testimony as to the outcome of the prior trial, where that information would be prejudicial. *See, e.g., United States v. Giovanelli*, 945 F.2d 479, 488–89 (2d Cir.1991).

Before turning to our analysis of Judge Block's evidentiary ruling, however, we briefly summarize the relevant portions of the trial transcript concerning Judge Block's alleged limitations on defense counsel's cross examination. During the cross examination of Natividad concerning his direct testimony about the plumbing dispute between Wilkerson and him, defense counsel asked Natividad whether he had testified about the dispute "two weeks ago." Natividad responded: "You mean in the last trial?" At that point, Judge Block cautioned the jury not to speculate about what had happened on that earlier occasion, or about what that occasion was. Out of the presence of the jury, Judge Block cautioned both sides that witnesses were not to be asked questions that would tend to elicit answers regarding the outcome of Duffy's trial.

Notwithstanding Judge Block's instruction, when Wilkerson's counsel resumed her cross examination of Natividad about the plumbing dispute, she asked: "[I]sn't it true that you brought that up because you were very unhappy about what happened at the last trial?" The Government objected, and Judge Block directed the witness not to answer the question. Judge Block then instructed the jury:

> I will tell you that there have been prior trials. There hasn't been a prior trial of Mr. Wilkerson.... [T]his witness testified at a prior trial and I will allow ... counsel to inquire whether [Natividad] testified differently at a prior trial than he is testifying in court today. But the results of that prior trial are matters which are pure speculation and you are not to reflect upon it based upon what has transpired here so far.

---

9. Since the requested instruction was overly restrictive and therefore not an accurate representation of the law in every respect, it was not a viable alternative to the charge given. However, we think that the better practice in Hobbs Act prosecutions such as this one would be for district judges, in instructing juries concerning the interstate commerce element of the Act, to make clear the distinction between those defendants who target the assets of a business and those who target the personal assets of an individual.

Judge Block also told Wilkerson's counsel not to "ask those types of questions."

Thereafter, and prior to the cross examination of Ligon, Judge Block again reminded Wilkerson's counsel not to refer to the result of the Duffy trial and asked counsel why she had done so when cross examining Natividad. Counsel incorrectly stated that she had not used the word "trial" and had not attempted to elicit from Natividad the result of the Duffy trial. Judge Block disagreed and cautioned counsel that, if she attempted to go down this road again, he would consider holding her in contempt. Judge Block stated, however, that counsel was free to elicit any inconsistencies from Ligon's testimony at Duffy's trial and that he was precluding counsel from eliciting only "the results of the prior trial."

After Ligon's direct testimony, Judge Block again stated that counsel had "carte blanche" on cross examination, provided that she did not seek to elicit the outcome of the Duffy trial. To quote Judge Block:

I have specifically allowed you to question the witness about when that prior trial occurred, it was just two weeks ago, and I gave you carte blanche to inquire into whatever was said or was not said at that prior trial for impeachment purposes . . . .

. . .

. . . When you were talking about the plumbing dispute. That was the only possible variance between this testimony here and this testimony at the prior trial about the plumbing dispute. . . .

Then you asked the question you were just dying to ask. ["]And isn't it true that you brought that up because you were very unhappy about what happened at the last trial?["]

Then I felt it was important for me to tell the jury, don't speculate, I don't want you to believe here that Mr. Wilkerson was involved in a prior trial, . . .

that maybe the prior trial resulted in a hung jury and this is a retrial.

. . . Here we have a codefendant who was acquitted, so it's not the defendant who was the subject of the prior trial . . . .

. . . [T]his is not the type of case where perhaps the witness testified about not being able to identify somebody at the prior trial but now changed their testimony in a material way about a critical issue and now says ["]I can identify the person.["]

. . .

So you have had ample opportunity to cross-examine. I am not going to restrict you in terms of your cross-examination of any witnesses, but I'm not going to allow you to bring before the jury the outcome of a prior trial against somebody other than this defendant as it turns out just because a witness may say something that may not be a hundred percent the same as they said at a prior trial.

Wilkerson's counsel replied that she was entitled to elicit from Ligon the Duffy trial's outcome to demonstrate that "Ligon . . . ha[d] suddenly refined her testimony in light of the acquittal in . . . Duffy." Abandoning her position that the Duffy acquittal was relevant to her cross examination of Natividad, counsel stated that her application was "based upon Sherry Ligon's testimony, not Natividad Lopez's testimony." Judge Block then asked counsel what there was about Ligon's testimony that counsel "would have looked to explore in terms of the outcome of the prior trial," and whether there was "something [Ligon had] said that was of great significance." According to counsel, Ligon had altered her "testimony about her film." Counsel contended that, in the Wilkerson trial, Ligon had testified that the last picture she had taken on her first

roll of film was of Duffy, whereas at the Duffy trial, Ligon testified that she had taken Duffy's picture on her second roll of film. Although counsel contended that this alleged discrepancy was "crucial," she did not articulate why it was crucial, and Judge Block adhered to his ruling.

In light of the above, Judge Block did not improperly limit defense counsel's attempt to show inconsistencies in Natividad's and Ligon's testimony from Duffy's trial. Although Judge Block initially cautioned the jury not to speculate on the occasion of Natividad's earlier testimony, moments later he instructed the jury that there had been prior trials (not involving Wilkerson) and cautioned the jury not to speculate about what happened at those trials. Still later in the day, prior to the cross examination of Ligon, Judge Block advised counsel that she was free to elicit any inconsistencies from Ligon's testimony at the earlier trial, subject to the caveat that she could not elicit the *results* of the prior trial. And after Ligon testified, Judge Block again stated that counsel had "carte blanche" on cross examination provided that she did not seek to elicit the *outcome* of the Duffy trial. Indeed, our review of the trial transcript reveals that defense counsel vigorously cross examined all of the Government's witnesses concerning their prior inconsistent statements, biases, and allegedly dubious credibility.

In light of the above, there is simply no merit to Wilkerson's contention that Judge Block "was adamant in precluding any reference to the prior trial." Accordingly, Judge Block's ruling was not an abuse of discretion.

IV. *Alleged "Vouching" Testimony by a Government Witness*

Finally, Wilkerson argues that he is entitled to a new trial because Judge Block should have prevented one of the police detectives who testified on behalf of

the Government from improperly "vouching" for Toney's credibility. *See United States v. Forrester,* 60 F.3d 52, 63 (2d Cir.1995) ("the credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial" (internal quotation marks omitted)). Because we find that the detective merely identified the matters that Toney had testified about that were not contained in any police reports, we conclude that this argument, too, is devoid of merit.

During her cross examination of Toney, Wilkerson's counsel challenged him with respect to how he had learned of the particulars of Wilkerson's case. She suggested that Toney had reviewed Wilkerson's "big stack of legal papers, cases[,] and police reports in [Wilkerson's] cell," or in the law library. Toney denied that he had done so. Counsel then asked if Wilkerson had shown Toney the police reports, which Toney denied.

To rebut defense counsel's suggestion that Toney had learned of Wilkerson's case by reading police reports (instead of from Wilkerson's confession), the Government sought to offer the testimony of the case detective to demonstrate that Toney had testified about matters that were not contained in any police reports. Judge Block agreed that defense counsel had suggested this and, over defense counsel's objection, agreed "to allow some limited questioning." According to the case detective, Toney testified to the following subjects that were not mentioned in the police reports: (i) that there had been a plumbing dispute between Wilkerson and Bilberto; (ii) that Wilkerson pulled up in front of a fire hydrant and saw Ligon in the window; (iii) that Duffy ran away from the crime scene; (iv) that Wilkerson provided two names at the police precinct; (v) that Wilkerson

complained to Duffy about a statement of Duffy's implicating Wilkerson; and (vi) that Wilkerson grew up with Duffy.

As the testimony summarized above indicates, the case detective never directly or indirectly expressed an opinion about Toney's credibility. Nor did the detective opine about whether Toney's testimony was accurate or whether the information contained in the police reports was accurate. Rather, the detective merely pointed out the information provided by Toney that was not in the police reports, and the admission of the detective's testimony in that respect was entirely proper. As Judge Block explained in overruling defense counsel's objection:

> [A]n important issue is where did Toney get this knowledge[;] did he get all this information from Wilkerson or could he have gotten that information from some other sources and certainly I think [the detective's] testimony is relevant testimony in order to elicit for the jury where this information may have come from. I can't think of anything more relevant.

Accordingly, we reject Wilkerson's argument that the detective's testimony constituted improper vouching and that Judge Block should have excluded it.

## CONCLUSION

For the foregoing reasons, the judgment of conviction is affirmed.