04-1369-cr
United States v. Hardwick

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2005

(Argued:  January 23, 2006          Decided: April 11, 2008)

Docket Nos. 04-1369-cr(L), 04-2886-cr(CON)

----------------------------------------------------

UNITED STATES OF AMERICA,

Appellee,

-   v.   -

STACEY HARDWICK and GLEN HARDWICK,

Defendants-Appellants.

----------------------------------------------------

B e f o r e:   WINTER, WALKER, and SOTOMAYOR, Circuit Judges.

Appeal from a conviction in the United States District Court for the Southern District of New York (Richard C. Casey, Judge) following a jury trial.  Appellant contends that the district court violated his Sixth Amendment rights by admitting hearsay statements from his co-conspirator's plea allocution.  We vacate the conviction and remand.

SUSAN V. TIPOGRAPH (Thomas Eddy, on the brief) New York, New York, for Defendant-Appellant Glen Hardwick.

1

BENJAMIN M. LAWSKY, Assistant United States Attorney (David N. Kelley, United States Attorney for the Southern District of New York, and Karl Metzner, Assistant United States Attorney, <u>of counsel</u>), United States Attorney's Office for the Southern District of New York, New York, New York, <u>for Appellee</u>.

WINTER, <u>Circuit Judge</u>:

Glen Hardwick appeals from a conviction after a jury trial before Judge Casey.[1] He was found guilty of conspiracy to commit and aiding and abetting a murder-for-hire, both in violation of 18 U.S.C. § 1958. In light of the Supreme Court's decision in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), he argues that the district court committed plain error in violation of the Sixth Amendment's Confrontation Clause when it permitted a plea allocution by his brother and co-conspirator, Stacey Hardwick, to be read into evidence. Glen further contends that there was legally insufficient evidence to prove the consideration element of the underlying murder-for-hire offense.

The admission of Stacey's plea allocution was plain error under <u>Crawford</u>. <u>See</u> <u>Johnson v. United States</u>, 520 U.S. 461, 466-67 (1997). We must therefore vacate Glen's conviction. However, because the evidence presented at trial -- including the improperly admitted plea allocution, <u>United States v. Cruz</u>, 363 F.3d 187, 197 (2d Cir. 2004) -- was legally sufficient to prove Section 1958's consideration element, we vacate, but do not reverse, the conviction and remand for further proceedings.

BACKGROUND

Viewing the evidence in the light most favorable to the government, see United States v. Wilkerson, 361 F. 3d 717, 721 (2d Cir. 2004), we recount the evidence at trial.

In late March 2002, the New York Police Department began an investigation into the sale of narcotics at the Skate Key, a skating rink and party venue in the Bronx. On March 23, 2002, Detective Marco Trujillo, in his undercover persona "Antonio," purchased cocaine and marijuana from Stacey, who was working the door of the Skate Key. In a conversation, Trujillo discussed his desire to "do[] future business" with Stacey, i.e., purchase drugs and guns from Stacey. Trial Tr. 145.

In a series of transactions over the next several months, Trujillo purchased varying quantities of cocaine and five guns from Stacey. As part of his cover, Trujillo claimed that he was an organized crime hit man and was constantly in need of new guns because he would use a gun only once, disposing of it after a killing to eliminate any evidence linking him to the murder.

On September 8, 2002, while in New Jersey, Trujillo received a voice message from Stacey on his cellular telephone, requesting that Trujillo call Stacey back immediately. When Trujillo returned Stacey's call, Stacey stated that a neighbor had pulled a gun on his brother Glen. Stacey told Trujillo that he wanted this neighbor to "go away," i.e., be killed, and if Trujillo could not do it, then Stacey would find someone else. Trial Tr. 173-74. Trujillo told Stacey that he would take the job, but "on the agreement that [Trujillo] would take a gun for payment." Id.

3

Trujillo informed Stacey that he would do the murder within a week.

On the morning of September 10, Trujillo recorded the first of two telephone conversations with Stacey that day.[2] During the first conversation, Trujillo informed Stacey that he would do the murder that night. Trujillo talked to Stacey (in coded terms) about procuring the gun he would use for the murder. Trujillo told Stacey that he was not going to charge Stacey for the hit, but that he needed two guns, "[o]ne for [Trujillo's] problem, one for [Stacey's] problem." Telephone Tr. 1, at 2. Trujillo informed Stacey that he was willing to do the killing "as a friendly gesture" and would pay for one gun but that the other gun would be Stacey's "cost." Id. Stacey, however, was unwilling to part with both weapons, claiming he needed at least one of them.

Approximately one hour later, Trujillo called Stacey, and they agreed to meet at the Olympic Diner on Jerome Avenue in the Bronx at five o'clock that evening. Trujillo again requested that Stacey bring two guns to the meeting. Stacey refused, claiming that he could bring only one because he and Glen needed the other. Trujillo grew angry at this development and told Stacey, "you know what . . . you better bring some fuckin' cash too. You want this done the right way, you bring some fuckin' cash." Telephone Tr. 2, at 3. The men agreed that Glen would join them at the meeting.

After meeting with other officers, Trujillo, wearing two

recording devices, went to the Olympic Diner.[3] When Stacey arrived, he was alone but informed Trujillo that Glen was outside in a truck with the gun. Stacey told Trujillo that he needed "a little bit of cash too" for the gun. Olympic/McDonald's Tr. 8. Trujillo became upset at Stacey's request for payment when Trujillo was "doing a job" for him, id., and responded, "lemme see the part [gun] and, I'll tell you what, I'll give you a couple . . . but why didn't you bring the other fucking thing [gun], I would've gave you money for that." Id. When Trujillo asked Stacey, "[w]hat're you looking at" -- i.e., how much money do you want for the gun -- Stacey replied, "at least a thousand." Id. Trujillo expressed disbelief at the request, but Stacey replied, "No, No, No, Lemme tell you what he [Glen] was asking. This is what he was asking . . . because he was gonna get rid of it. But I said no, you can't get rid of it when you have this fuckin' cockaroach [the intended victim] out there, right." Id. at 9.

Shortly after this exchange, a waitress and her boyfriend began having a loud dispute; when the waitress threatened to call the police, Stacey became nervous and suggested relocating to a McDonald's down the street. On Trujillo's way to the McDonald's (and while coordinating the new location with his undercover team), Stacey and Glen approached Trujillo, and Trujillo introduced himself to Glen. Stacey offered to make the necessary exchanges -- the transfer of the gun and the information on how to locate the intended victim -- right there, but Trujillo

refused, insisting that Stacey and Glen both join him at the McDonald's.

Once in McDonald's, Trujillo, Stacey, and Glen sat together at a table. Stacey had brought the gun in a paper bag from his car into the McDonald's; when he took the gun out and tried to hand it to Trujillo across the table, Trujillo told Stacey to leave the gun in the bag. Glen gave Trujillo details on the intended victim's physical appearance (nationality, height, hair color, and usual attire) as well as where and when he could be found. Glen gave Trujillo a pen to write the location down on the bag containing the gun. Trujillo then told Glen that he was doing the murder "as a friend to [Stacey] . . . as a good gesture to [Stacey] because [Trujillo] fucked him on something . . . a misunderstanding." Id. at 21.

Stacey concluded the conversation with "Let's do what we gotta do. Alright"; Trujillo responded, "Alright. No problem, I'm going over to my car right now, let's go." Id. Stacey replied, "Yo . . . you got any change on you," and Trujillo said, "Yeah, in my car." Id. Stacey then asked that they go "pick it up." Id. As they were exiting, Trujillo began saying "it's a done deal," which was the code for his police team to come in and make the arrest. Id. at 22-23.

Glen was charged in a four-count indictment with: (i) conspiring to commit murder-for-hire, in violation of 18 U.S.C. § 1958; (ii) aiding and abetting a murder-for-hire, in violation of 18 U.S.C. §§ 1958 and 2; and two other counts dropped by the

6

government prior to Glen's trial.  Also prior to Glen's trial, Stacey pleaded guilty to, <u>inter alia</u>, conspiring to commit murder-for-hire and committing murder-for-hire.

Glen's trial commenced on June 17, 2003.  The jury heard recordings of various telephone calls between Stacey and Trujillo as well as of the face-to-face meeting between Trujillo, Stacey, and Glen.  Trujillo testified extensively in front of the jury about his undercover operation, the events leading up to Stacey's and Glen's arrests, and his interpretation of the various recordings played for the jury.  The court also allowed Stacey's plea allocution to be admitted into evidence.  While it did not mention Glen, the allocution stated that Stacey "agreed and conspired to cause [another] person to travel in interstate commerce with the intent that a murder be committed in exchange for payment.  The payment for the intended murder was a .32 caliber pistol."  Plea Tr. 18, May 30, 2003.  The defense objected to the reading of the plea allocution and requested that limiting instructions be given to the jury.  The district judge agreed and told the jury that it could "consider these statements as evidence of the activities of the person who made the statement and that is relevant to this case," but that the statements could be considered only as to whether a conspiracy existed and "[w]hether the crime of murder for hire was committed as part of that conspiracy."  Trial Tr. 582.  The judge cautioned that "[t]he question whether the defendant Glen Hardwick participated in the conspiracy . . . is an issue for which you

7

will have to rely on other evidence. . . . There is nothing in Stacey Hardwick's statement that answers" the question of whether Glen participated in the conspiracy. Id. at 582-83.

While deliberating, the jury asked for, and received, a re-reading of the portion of the transcript containing Stacey's plea allocution and a replaying of the recordings of both September 10 phone conversations. The jury returned with verdicts of guilty on both counts of the indictment.

DISCUSSION

On appeal, Hardwick challenges his conviction on the following two grounds. First, in light of the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), he contends that the district court's admission of Stacey's plea allocution violated the Sixth Amendment's Confrontation Clause. Second, Glen argues that the evidence was legally insufficient to prove the consideration element of the substantive murder-for-hire offense. We address each of these claims in turn.

a)    Confrontation Clause Claim

The government concedes that under the Supreme Court's decision in Crawford, the admission of Stacey's plea allocution was in error. However, the government argues that we are limited to plain error review because Glen's counsel failed to raise a Confrontation Clause objection at trial.

Although defense counsel made a general objection to the reading of Stacey's allocution (and asked for a limiting instruction, which was given), she did not mention the

8

Confrontation Clause, the Sixth Amendment, or any Confrontation Clause caselaw in her objection. The objection failed to "put [the] trial court on notice that Confrontation Clause concerns [were] implicated"; thus, harmless error review is inappropriate, and we review the constitutional issue for plain error. United States v. Dukagjini, 326 F.3d 45, 60 (2d Cir. 2002).[4]

For us to correct an error not raised at trial, "there must be (1) error, (2) that is plain, and (3) that affects substantial rights." Johnson, 520 U.S. at 466-67 (internal quotation marks and alterations omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Id. at 467 (internal quotation marks omitted). Because the error here was not "structural," in other words, a "defect affecting the framework within which [a] trial proceeds," Arizona v. Fulminante, 499 U.S. 279, 310 (1991), we will conclude that it affected the defendant's substantial rights only if the error was "prejudicial" to the defendant and "affect[ed] the outcome of the district court proceedings," United States v. Bruno, 383 F.3d 65, 79 (2d Cir. 2004).

The admission of Stacey's plea allocution against Glen meets the test for reversible plain error. "An error is 'plain' if it is 'clear' or 'obvious' at the time of appellate consideration." United States v. Thomas, 274 F.3d 655, 667 (2d Cir. 2001). Although co-conspirator plea allocutions were admissible under

our caselaw at the time of Glen's trial, we have since held that they are testimonial hearsay and are inadmissible under the Confrontation Clause unless the co-conspirator testifies at trial, or is unavailable at trial and the defendant had a prior opportunity for cross-examination. United States v. Becker, 502 F.3d 122, 129-30 (2d Cir. 2007); United States v. McClain, 377 F.3d 219, 22 (2d Cir. 2004); see also Crawford, 541 U.S. at 53-54. Because the plea allocution was admitted without meeting these requirements, the error is plain.

Furthermore, the plea allocution affected Glen's substantial rights because it almost surely influenced the jury's verdict. Bruno, 383 F.3d at 79 (2d Cir. 1999) ("[A]n error affects a defendant's substantial rights if it is prejudicial and it affected the outcome of the district court proceedings." (internal quotation marks omitted)). As discussed below, the sufficiency issue with regard to the consideration element of the murder-for-hire statute is close. Without the plea allocution, the issue largely turns on Stacey's state of mind as inferred from the recorded conversations. With the plea allocution, the issue is much easier because the allocution was a direct admission by Stacey that he intended the pistol he gave to Trujillo to constitute a quid pro quo for Trujillo's promise to murder the victim. As such, the plea allocution almost certainly contributed to the jury's verdict.

First, the judge's limiting instructions informed the jury that it should not consider the allocution as evidence that Glen

10

was part of the murder-for-hire conspiracy but that it could consider the plea allocution as evidence that Stacey had violated the murder-for-hire statute in his dealings with Trujillo. Thus, the jury was explicitly permitted to consider the plea allocution on the issue of whether the gun constituted consideration for Trujillo's promise to murder the victim -- an issue as to which the evidence, absent the plea allocution, was very close. Cf. Bruno, 383 F.3d at 80.

Second, the government referred specifically to the plea allocution in its closing arguments, stating "you have Stacey Hardwick's guilty plea allocution, where he admitted to conspiracy to commit a murder-for-hire. There is no dispute that a conspiracy existed." Trial Tr. 707. Finally, the plea allocution was re-read to the jury at their request during deliberations. Indeed, it is extremely doubtful that the jury even examined other evidence going to Stacey's state of mind, given the nature and force of the plea allocution.

Therefore, the fairness and integrity of the proceedings in this case were seriously affected by the unconstitutional admission of the hearsay statements in Stacey's plea allocution. Thomas, 274 F.3d at 671. As a result, we vacate the judgment of conviction.

b)    Sufficiency of the Evidence

Glen also challenges his conviction by contesting, inter alia, the sufficiency of the evidence with respect to Section 1958's consideration element. Glen argues that Stacey did not

11

intend the gun he gave Trujillo to be something of "pecuniary value" in exchange for Trujillo's promise to murder the intended victim.

### 1.    Murder-for-Hire Under 18 U.S.C. § 1958

The murder-for-hire statute provided:

> Whoever . . . uses or causes another . . . to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall [be guilty of a crime under this section].

18 U.S.C. § 1958(a) (2000).  "The federal murder-for-hire statute proscribes a very limited category of behavior; only those instances in which one party agrees to commit a murder in exchange for another party's provision (or future promise) of payment are punishable under § 1958."  United States v. Frampton, 382 F.3d 213, 217 (2d Cir. 2004).

The consideration requirement of Section 1958 is interpreted in "the traditional sense of bargained for exchange," United States v. Wicklund, 114 F.3d 151, 154 (10th Cir. 1997), so that there must be a "quid-pro-quo (or at least the promise of such) between the parties to the transaction," United States v. Hernandez, 141 F.3d 1042, 1057 (11th Cir. 1998).  See also United States v. Richeson, 338 F.3d 653, 657 (7th Cir. 2003) ("[C]onsideration retains its contract law meaning of a bargained-for exchange of something of value."); United States v. Washington, 318 F.3d 845, 854 (8th Cir. 2003).

When the defendant is the solicitor of the murder-for-hire,

12

it is the defendant's intent that controls. Richeson, 338 F.3d at 656 ("The federal murder-for-hire statute requires the government to prove that the accused intended for a murder to be committed" as consideration for something of pecuniary value. (emphasis added)). The nature of the solicitor's intent is especially important when the would-be murderer is an undercover agent who by definition never intends to commit the crime. See generally United States v. Ritter, 989 F.2d 318, 321 (9th Cir. 1993) (reversing convictions for conspiracy to commit murder-for-hire for two defendants: the first did not know anyone was paid to commit the murder; the second also lacked the required intent because the government agent pretending to be a hit man said he would not charge anything for the murder).

Under Section 1958, the term "anything of pecuniary value" is defined as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958(b)(1). The promise of a future, unspecified favor -- in the absence of any evidence suggesting that either party to the agreement had an understanding of what form such a favor would take -- does not constitute pecuniary value under Section 1958. Frampton, 382 F.3d at 219. However, the pecuniary value requirement is satisfied, for example, by the payment or promise of sale-level quantities of drugs, Washington, 318 F.3d at 854, insurance proceeds, Hernandez, 141 F.3d at 1057-58, or a promise to reimburse a hit man for a firearm purchase in addition to

13

letting him keep the firearm, Richeson, 338 F.3d at 656-57. Thus, "the mere fact that the consideration offered . . . could inure to the economic benefit of the [murderer] is insufficient. Rather, there must be some evidence to establish that at the time the agreement was formed, the consideration was something the 'primary significance' of which lay in its 'economic advantage.'" Frampton, 382 F.3d at 219 (quoting 18 U.S.C. § 1958(b)(1)).

    2.   Application

Although we "review a claim of insufficient evidence de novo[,] . . . a defendant challenging his verdict on sufficiency grounds bears a heavy burden.  We must uphold the jury's verdict if we find that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Lewter, 402 F.3d 319, 321 (2d Cir. 2005) (internal quotation marks, citations, and alterations omitted). Moreover, "[w]e are to view the evidence, whether direct or circumstantial, in the light most favorable to the government," United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993), and defer to the jury by "resolv[ing] all inferences from the evidence and issues of credibility in favor of the verdict," United States v. Howard, 214 F.3d 361, 363 (2d Cir. 2000).  We consider the evidence in its totality and "'may not substitute our own determinations of credibility or relative weight of the evidence for that of the jury.'"  United States v. Dhinsa, 243 F.3d 635, 648 (2d Cir. 2001) (quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000)).

14

In circumstances where, as here, "some government evidence was erroneously admitted, we must make our determination concerning sufficiency taking into consideration even the improperly admitted evidence." Cruz, 363 F.3d at 197; see also Lockhart v. Nelson, 488 U.S. 33, 39-40 (1988) (holding that "where the evidence offered by the State and admitted by the trial court -- whether erroneously or not -- would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial"); Bruno, 383 F.3d at 81 ("[I]n assessing a legal-sufficiency challenge, we must consider improperly admitted hearsay testimony."); United States v. Glenn, 312 F.3d 58, 67 (2d Cir. 2002) (considering improperly admitted testimony in evaluating a sufficiency challenge).[5]

Where "'the evidence is determined to be insufficient when the improperly admitted evidence is excluded from the equation but sufficient when the improperly admitted evidence is included in the equation, the remedy is affected. In such a case, retrial rather than acquittal is the remedy.'" Bruno, 383 F.3d at 90 n.20 (quoting Cooper v. McGrath, 314 F. Supp. 2d 967, 999 (N.D. Cal. 2004)). If, however, we conclude that the evidence is legally insufficient even with the improperly admitted hearsay, the appropriate remedy is acquittal. United States v. Santos, 449 F.3d 93, 95 (2d Cir. 2006) (noting that "the proper remedy for a successful sufficiency of the evidence claim is acquittal").

In order to convict Glen, a jury would have to find beyond a

15

reasonable doubt that Stacey intended the gun he provided Trujillo to serve as consideration (i.e., a quid pro quo) for Trujillo's promise to murder the intended victim. Providing a gun as payment for committing murder violates Section 1958. See Frampton, 382 F.3d at 219 (noting that consideration element could be satisfied where the consideration is "valuable firearms"); Richeson, 338 F.3d at 657 (finding the consideration element of Section 1958 established based on evidence that "[t]he payment offered took the form of money to buy the murder weapons, with the promise to allow the murderer to keep the weapon when he finished the job"). However, simply giving a hit man a gun to be used only to commit the specific murder does not. Thus, the jury would have to find that Stacey thought Trujillo would not dispose of the gun following this particular killing even though Trujillo previously told Stacey that whenever he killed someone with a gun, he always disposed of it to eliminate the evidence. As noted above, if we include Stacey's improperly-admitted plea allocution in our analysis, the question becomes much easier. In his allocution, Stacey conceded that he "agreed and conspired to cause [another] person to travel in interstate commerce with the intent that a murder be committed in exchange for payment. The payment for the intended murder was a .32 caliber pistol." Plea Tr. 18, May 30, 2003. This is a direct admission that the gun was intended as "payment" for the murder and as such, it is easily sufficient to prove Section 1958's consideration element and to uphold the jury's verdict. We therefore conclude that the

evidence was legally sufficient.[6]

Excluding Stacey's plea allocution leaves a very different factual record; to convict, the jury would have to infer, from the recorded conversations, that Stacey intended the gun to serve as payment. My colleagues would end the discussion here and not opine further on the sufficiency of the evidence absent the plea allocution.[7] I believe, however, that, having said all that is set out above on the issue, we should, in the interests of efficiency, inform the parties of our views on the sufficiency issue absent the plea allocution.[8] My colleagues would intimate no view on that matter.

Turning to that issue, and noting again that my colleagues do not join in the discussion, I believe that at least one scenario might reasonably be found by a jury to be sufficient to meet Section 1958's consideration requirement. To be sure, one possible version of events is that Stacey fully expected, or even hoped, that Trujillo would dispose of the weapon after killing the victim, as Trujillo frequently stated. As noted above, if Stacey understood and intended that Trujillo would dispose of the weapon after the murder, then the primary significance of the gun was to enable the commission of the murder, not to provide Trujillo with a "profit" for the crime. Once the crime was committed and the weapon disposed of, there would be no economic value to the murderer.

A reasonable jury, however, might find an alternative scenario, namely that Stacey was engaged in what he understood to

17

be a business negotiation in which the gun had value beyond its use in the anticipated murder, was either indifferent to or doubted Trujillo's stated willingness to dispose of the gun after the murder, and wanted to lower his "costs" by receiving some cash as well as the murder in exchange for the gun. In my view, that state of mind would be sufficient to meet the quid pro quo requirement.

A jury could easily find that Stacey, until the point of his arrest, wanted -- and even expected -- to be paid for the firearm. When Trujillo asked Stacey to get the murder weapon, the following exchange took place:

```
Trujillo: Alright, go get me what I need and tell . . .
Stacey:   I need a little bit of cash too.
Trujillo: How much?
Stacey:   I brought you a box [gun] already so . . .
Trujillo: I'm fucking, I'm doing a job for you. . . .
          I'm doing a job for you . . . and you want me
          to pay you?
          . . . Lemme, lemme see the part [gun] and,
          I'll tell you what, I'll give you a couple .
          . . but why didn't you bring the other
          fucking thing, I would've gave you money for
          that.
Stacey:   Yo, I asked you a question, I cannot be left
          with . . .
Trujillo: What're you looking at?
Stacey:   . . . at least a thousand.
Trujillo: A thousand!
Stacey:   No, No, No, Lemme tell you what he [Glen] was
          asking. This is what he was asking . . . he
          was asking for . . . because he was gonna get
          rid of it. But I said no, you can't get rid
          of it when you have this fuckin' cockaroach
          [sic] out there, right . . .
```

Olympic/McDonald's Tr. 8-9. As the three men exited the McDonald's, and right before Trujillo signaled for the arrest to be made, Stacey still sought payment from Trujillo:

18

```
Stacey:    Let's do what we gotta do.  Alright.
Trujillo: Alright.  No problem, I'm going over to my
          car right now, let's go.
Stacey:    Alright?
Trujillo: Let's get out of here.
Stacey:    Yo, uh . . . you got any change on you?
Trujillo: Yeah, in my car.
Stacey:    Let's go pick it up.
```

Id. at 21.

Glen argues that these conversations show only that Stacey intended to sell the gun, a state of mind inconsistent, in his view of the evidence, with using the gun as payment for the murder.  A jury, however, might also reasonably find that the "sale" proposal indicated Stacey's indifference and doubt as to Trujillo's intent to throw the gun away rather than keep it after the murder.  It might well conclude that Stacey's demands reflected a belief that Trujillo would pay some money for the gun and commit the murder, acts that a jury might believe made sense to Stacey only if the gun was to be kept after the murder.  Indeed, a jury might find that Stacey was encouraged in such a belief by Trujillo's reaction, which, while incredulous at being asked to pay for the gun, was hardly a refusal.  In fact, Trujillo mentioned that he could "give [Stacey] a couple," id. at 8, and Stacey was about to go to Trujillo's car to get the "change" when arrested, id. at 21.

In my view, a rational jury could therefore infer that Stacey's demand for cash and a failure to insist that Trujillo dispose of the gun reflected Stacey's intent that the gun be a quid pro quo for the murder.  Whether this was Stacey's state of mind, however, is a jury question.

19

CONCLUSION

For the reasons discussed above, we vacate the judgment of conviction entered by the district court and remand for further proceedings.

FOOTNOTES

1.  Stacey Hardwick, the other defendant-appellant in this case, previously withdrew his appeal.

2.  The two telephone conversations on September 10, 2002, occurred at approximately 11:12 a.m. and 12:10 p.m.  The 11:12 a.m. conversation will be cited as "Telephone Tr. 1, at (pincite)."  The 12:10 p.m. conversation will be cited as "Telephone Tr. 2, at (pincite)."

3.  Citations to the transcript of the September 10, 2002 face-to-face meeting between Trujillo, Stacey, and Glen -- which took place inside the Olympic Diner, outside the Olympic Diner, and at a nearby McDonald's Restaurant -- will take the form of "Olympic/McDonald's Tr. (pincite)."

4. "When the source of plain error is a supervening decision," this court has "employed a modified plain error standard whereby the government bears the burden of proving that the error did not affect the defendant's substantial rights."  United States v. Lombardozzi, 491 F.3d 61, 74 n.4 (2d Cir. 2007).  Whether this standard has been overruled by Johnson v. United States, 520 U.S. 461 (1997), and whether it applies to unpreserved Crawford errors, such as the one at issue here, remain open questions. Because we conclude that the error is plain even under the more

21

stringent standard applied to "non-structural" errors where the burden rests on the defendant to prove plain error, we need not decide those questions at this time. <u>United States v. Bruno</u>, 383 F.3d 65, 79 n.8 (2d Cir. 2004).

5. We note that this caselaw appears to be in tension with <u>United States v. Jones</u>, 393 F.3d 107, 109 (2d Cir. 2004), where this court made its sufficiency determination without weighing evidence admitted at trial in violation of <u>Crawford</u>. In that case, however, the government conceded that the improperly admitted evidence should not be considered in deciding the sufficiency issue, and the court did not independently analyze whether this was the proper course. <u>Id.</u> at 111. As a result, we do not believe that the resolution of this issue is part of the binding holding of <u>Jones</u>. <u>See Getty Petroleum Corp. v. Bartco Petroleum Corp.</u>, 858 F.2d 103, 113 (2d Cir. 1988) (noting that a "<u>sub silentio</u> holding is not binding precedent" (internal quotation mark omitted)); <u>United States v. Johnson</u>, 256 F.3d 895, 916 (9th Cir. 2001) (en banc) (stating that a court is not bound by a statement of law "made casually and without analysis, . . . uttered in passing without due consideration of the alternatives or where it is merely a prelude to another legal issue that commands the panel's full attention").

6. In his appellate brief, Glen challenges the sufficiency of the evidence with respect to the interstate nature of the telephone

22

calls between Stacey and Trujillo; he claims there is insufficient proof that Trujillo was in New Jersey when he had several phone conversations with Stacey. Glen seemingly argues that, by using the phrase "facility in interstate" commerce, Section 1958 requires that the telephone call be made across state lines. We rejected this argument, however, in United States v. Perez, 414 F.3d 302, 304 (2d Cir. 2005) (holding that Section 1958's "facility in" language covered wholly intrastate usage of the facility because "the phrases 'facility of interstate commerce' and 'facility in interstate commerce' are to be used interchangeably." (citing United States v. Marek, 238 F.3d 310, 321 (5th Cir. 2001))).

Glen also argues that the evidence was insufficient to find that he was a member of the conspiracy to commit, or aided and abetted a murder-for-hire. We disagree. The jury could easily find that Glen possessed the gun, helped turn it over to Trujillo, and was present when Stacey said he was going to "pick up" the "change" in Trujillo's car. This evidence is sufficient to permit a jury to reasonably infer that Glen knew about the enterprise and intended to participate in it or make it succeed. United States v. Johnson, 513 F.2d 819, 823 (2d Cir. 1975).

7. While Lockhart v. Nelson, 488 U.S. 33 (1988), compels us to review the sufficiency of the evidence, including improperly-admitted evidence, to determine whether the Double Jeopardy Clause bars a retrial, that rule does not preclude us from

23

informing the parties as to our view of the sufficiency issue absent the plea allocution. If a defendant has been convicted and an appellate court reverses based on its determination that the evidence produced at trial was legally insufficient, the Clause precludes a new trial. Burks v. United States, 437 U.S. 1, 18 (1978). The reasoning behind this rule is that the appellate ruling is the functional equivalent of a judgment of acquittal at the close of evidence. See Lockhart, 488 U.S. at 39, 41-42. Where the reversal is based on evidentiary error and the evidence is sufficient if the inadmissible evidence of a prejudicial nature is included in the equation, a defendant does not, under Lockhart, have double-jeopardy protection against a new trial. The reasoning behind this rule is that, under the Clause, such a reversal entitles a defendant only to an error-free trial and allows the prosecution an opportunity in a retrial to substitute other evidence to support a conviction. Id. at 40-42. The rule does not, therefore, preclude us from opining on the sufficiency issue absent the plea allocution for purposes of judicial efficiency. See Note 8, infra.

8. When a retrial is a possibility, we routinely rule on fully argued issues that will arise in such a retrial, lest serial appeals, reversals, and multiple retrials result. See, e.g., Arnold v. County of Nassau, 252 F.3d 599, 604 (2d Cir. 2001) ("Since the case will be retried, we think it might assist the district court upon retrial, and this court upon further review,

24

to have the benefit of a few observations."); <u>Blyden v. Mancusi</u>, 186 F.3d 252, 269 (2d Cir. 1999) ("Although our disposition of this matter lessens the importance to this appeal of appellant's [second] claim . . . we nevertheless address it in light of the fact that retrials seem inevitable."); <u>Thornley v. Penton Pub., Inc.</u>, 104 F.3d 26, 31(2d Cir. 1997) ("We think it appropriate to give guidance on certain issues that may arise again on retrial."); <u>United States v. Ajmal</u>, 67 F.3d 12, 15 (2d Cir. 1995) ("While we vacate the proceeding below, we next address [the defendant's] and the government's remaining contentions to give the district court guidance on retrial and in the event of resentencing;"); <u>United States v. Salerno</u>, 937 F.2d 797, 811 (2d Cir. 1991) ("Since we reverse the convictions of all defendants on other grounds, it is not necessary to reach this issue in order to decide this appeal.  Nevertheless, since a retrial is likely, we offer some guidance on this subject."), <u>rev'd on other grounds</u>, 505 U.S. 317 (1992).

It is a very inefficient use of judicial resources to remand this case without guidance on the sufficiency issue.  If the admissible evidence was legally insufficient, why shouldn't the government know that without more evidence it cannot get a valid conviction at a retrial?  Similarly, why should the appellant be subjected to a retrial in such circumstances, if additional evidence is not available?  In other words, the fact that a retrial would not be precluded on double jeopardy grounds is a reason for our informing the parties whether a retrial without

25

the improperly-admitted evidence would lead to a valid conviction.  Indeed, with the concurrence of my colleagues, this opinion goes into detail as to the legal principles relevant to sufficiency in order to guide a retrial.  I would not stop just before providing the parties with the dispositive information.