08-4211-cr (L)
United States v. Nadirashvili (Solomonyan)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued: February 9, 2011                    Decided: August 23, 2011)

Docket Nos.  08-4211-cr(L), 09-0074-cr(CON), 09-0610-cr(CON),
         09-1493-cr(CON), 09-3266-cr(CON), 09-3801-cr(CON)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

             Appellee,

                  v.

NIKOLAI NADIRASHVILI, also known as Nikoloz Nadirashvili, also
known as Nikush, LEVAN CHVELIDZE, DIMITRIY VOROBEYCHIK, IOSEB
KHARABADZE, also known as Soso, CHRISTIAAN DEWET SPIES, also
known as David, and ARTUR SOLOMONYAN, also known as Alex,

             Defendants-Appellants,

JOSEPH COLPANI, also known as Joe, MICHAEL GUY DEMARE, also known
as Michel, ARMEN RAZMIK BARSEGHYAN, SPARTAK VAHAGN YERIBEKYAN,
LEVON SOLOMONYAN, ALLAH MCQUEEN, RAJAB CHAVIS, also known as
Jabs, also known as Keith Chavis, GAREGIN GASPARYAN, also known
as Garik, MICHAEL JIMENEZ, also known as Mike, NIEMAN MYLES, also
known as Luis, WILLIAM JESUS THOMAS, VAKHTANG MACHITIDZE, TIGRAN
GEVORGYAN, also known as Tiko, ARMAND ABRAMIAN, also known as
Armo,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, POOLER, and HALL, Circuit Judges.

     Appeals by six defendants from a conviction after a jury

trial in the United States District Court for the Southern

1

District of New York (Richard J. Holwell, <u>Judge</u>) for a variety of weapons trafficking offenses.  Appellants challenge, <u>inter alia</u>, the sufficiency of the evidence underlying their convictions, the constitutionality of 22 U.S.C. § 2778(b)(1)(A)(ii) as applied to one appellant, and the district court's Sentencing Guidelines calculation for another appellant.  We find that the district court used the wrong standard in applying certain offense level enhancements under Section 2K2.1(b) of the Federal Sentencing Guidelines during one appellant's offense level calculation.  We therefore vacate that appellant's sentence and remand for resentencing.  We affirm in all other respects.

HERALD PRICE FAHRINGER (Erica T. Dubno, Nicole Neckles, <u>on the brief</u>), Fahringer & Dubno, New York, New York, <u>for Defendant-Appellant Nadirashvili</u>.

Susan V. Tipograph, Thomas Eddy, New York, New York, <u>for Defendant-Appellant Chvelidze</u>.

KELLY J. SHARKEY, Brooklyn, New York, <u>for Defendant-Appellant Vorobeychik</u>.

JAMES E. NEUMAN, New York, New York, <u>for Defendant-Appellant Kharabadze</u>.

JOHN BURKE, Brooklyn, New York, <u>for Defendant-Appellant Spies</u>.

SETH GINSBERG (Louis V. Fasulo, Fasulo, Shalley, and DiMaggio, New York, New York, <u>on the brief</u>), New York, New York, <u>for Defendant-Appellant Solomonyan</u>.

DAVID B. MASSEY, Assistant United States Attorney (Preet Bharara, United States Attorney, on the brief, Matthew L. Schwartz and Andrew L. Fish, of counsel), United States Attorney's Office for the Southern District of New York, New York, for Appellee.

WINTER, Circuit Judge:

Nikolai Nadirashvili, Levan Chvelidze, Dimitriy Vorobeychik, Ioseb Kharabadze, Christiaan Dewet Spies, and Artur Solomonyan appeal from their convictions after a jury trial before Judge Holwell. Appellants were convicted of a variety of weapons trafficking offenses, described in greater detail below. These appeals followed.

We address three of the many issues raised by appellants, finding, after due consideration, their remaining arguments to lack merit. We hold that the evidence was sufficient to support all of the convictions and reject a vagueness-as-applied argument raised by Kharabadze. However, the district court employed the wrong standard of proof at sentencing in imposing increases to Solomonyan's base offense level under Section 2K2.1(b)(1)(E) and (b)(3)(A) of the Federal Sentencing Guidelines. We therefore vacate Solomonyan's sentence and remand for resentencing. Otherwise, we affirm.

BACKGROUND

a) The Evidence

Because this is an appeal from a jury trial, we briefly

3

describe the evidence in the light most favorable to the government.  See United States v. Gomez, 580 F.3d 94, 97 (2d Cir. 2009).

From February 2004 until March 2005, the government conducted an investigation into a suspected weapons trafficking ring with the aid of confidential source Kelly Davis.  Davis posed as a middleman for buyers of firearms and explosives while cooperating with the government.  Upon the government's direction, David resumed prior conversations with Spies about Spies' efforts to obtain something "Russian made" for Davis.  Spies put Davis in touch with Solomonyan, who in turn contacted Kharabadze.  Using court-authorized wiretaps, the government recorded calls between Solomonyan and Kharabadze in which Kharabadze said, "[e]verything has been put on hold" because "government forces . . . relocated [to the Russian side] and there's no making a deal with them."  Solomonyan reported back to Spies about the "obstacles."  A few days later, however, Solomonyan told Spies he was dealing with "very serious people" and that the deal was "ninety-nine point nine percent."

In May 2004, Davis, Spies, and Solomonyan discussed how to obtain and ship "grenades," "warheads," "missiles," and "launchers," and Solomonyan repeatedly asked Davis to create an order list.  The following month, Solomonyan asked Kharabadze to create a price list because he "ha[d] to show [the buyer] something real."  Kharabadze agreed to create the list and told

4

Solomonyan he could pick it up the following morning. The next day, before leaving to attend a meeting with Davis and Spies, Solomonyan visited Kharabadze's apartment building for approximately an hour. At the meeting with Davis and Spies, Solomonyan wrote something on a piece of paper, handed it to Davis, and told him to memorize it. In addition to discussing the weapons on the list, Solomonyan also told Davis that he had "overstayed" his visa and asked whether Davis could help. The meeting was resumed two days later, when the three discussed weapons, dimensions, shipping options, and prices in some detail.

Later that month, Solomonyan spoke over the phone with a man named Artur Barseghyan about "exercises taking place [in Leninakan, Armenia]" in which "everything that Georgia owned was dumped there. And it's being actively taken out of there." Six months later, in December 2004, Solomonyan spoke to Armen Baregamyan, who was in Azerbaijan, about "merchandise" that would go from Leninakan to Georgia to the United States. In January 2005, Davis, at the direction of the FBI, told Solomonyan and Spies that he was "under a lot of pressure" and that the "time limit is two weeks." He also said that he had green cards for Solomonyan and Spies, but could not deliver them until he got the "products."

Over the following two weeks, Solomonyan made contact with a man in Armenia and managed to obtain digital photographs by email of various weapons that were allegedly available, including a

5

mortar launcher, anti-tank gun, and several missile launchers. At a meeting in March 2005, Solomonyan showed these photos to Davis, and the FBI arrested Solomonyan and Spies.

As the events above were unfolding, the government instructed Davis to also try to obtain machine guns and semi-automatic rifles already in the United States. In July 2004, Solomonyan and Spies spoke about buying new and used "apartments," which the government contended was code for machine guns. On September 11, 2004, Davis gave money to Solomonyan to purchase guns. The same day, Solomonyan called Nadirashvili to ask whether Nadirashvili knew where he could purchase "cars . . . with automatic transmission[s]." Solomonyan explained that he had "been talking to a dealer for a week now" and that a "man came today, gave me the money," but that the dealer had vanished at the last minute. Nadirashvili said, "I understand what you are talking about," and told Solomonyan he would call Chvelidze to see if he could arrange anything. Nadirashvili immediately called Chvelidze. After some initial confusion during which time Chvelidze thought Nadirashvili was talking about actual cars, Chvelidze caught on and told Nadirashvili that he could not get them that day, but to "[t]ell me if you want to place an order or something." Nadirashvili relayed this information to Solomonyan. Solomonyan called Chvelidze the following day to verify that Nadirashvili "told [Chvelidze] about the cars." Chvelidze confirmed this, and said he would try to help. Solomonyan also

spoke to Nadirashvili again, who said he would "walk around Brighton" to "see if there's anything there."  Neither Nadirashvili nor Chvelidze ultimately obtained any firearms for Solomonyan.

Solomonyan also spoke with Vorobeychik on September 12. Vorobeychik informed Solomonyan that he had told a third party, "[Solomonyan] will call you.  Don't be afraid of what he's going to talk to you about."  Solomonyan said, "I'll call him now," and immediately placed a phone call to Allah McQueen.  There was some confusion while Solomonyan tried to get McQueen to understand what he meant by "big trucks with . . . fully automatic transmission."  However, after Solomonyan said, "Listen, of course I am not talking about vehicles," McQueen said he understood what they were talking about.  Over the next week, Solomonyan and McQueen had a number of phone conversations in which they spoke about setting up a deal involving "dogs," "puppies," an "AK," "dog food," and "an Israeli," which the government argued was code.  On September 30, Vorobeychik asked Solomonyan, "[c]an they really get it?" and Solomonyan responded, "Well, I only need two pieces."  Vorobeychik later told law enforcement agents that "they" referred to McQueen.  In a conversation in October, Vorobeychik and Solomonyan discussed the possibility of "build[ing] the empire" by dealing directly with McQueen.  McQueen ultimately provided Solomonyan and Spies with three firearms.  Solomonyan and Spies also obtained five

7

additional firearms, apparently without Vorobeychik's assistance.

b) <u>The Verdict and Sentencing</u>

The jury convicted Solomonyan, Spies, and Kharabadze of engaging in a conspiracy to traffic in foreign defense articles, in violation of 22 U.S.C. § 2778(b)(1)(A)(ii) and (c) and 18 U.S.C. § 922(a)(4), and of trafficking in foreign defense articles (or aiding and abetting thereof), in violation of 22 U.S.C. § 2778(b)(1)(A)(ii) and (c). Solomonyan, Spies, Vorobeychik, Nadirashvili, and Chvelidze were convicted of engaging in a domestic firearms trafficking conspiracy, in violation of 18 U.S.C. § 922(a)(1)(A) and (o), of firearms trafficking (or aiding and abetting thereof), in violation of 18 U.S.C. § 922(a)(1)(A) and of interstate firearms trafficking (or aiding and abetting thereof), in violation of 18 U.S.C. § 924(n). Solomonyan and Spies were also convicted of illegal transfer and possession of a machine gun (or aiding and abetting thereof), in violation of 18 U.S.C. § 922(o), and being illegal aliens in possession of a firearm (or aiding and abetting thereof), in violation of 18 U.S.C. § 922(g)(5). The district court sentenced appellants as follows: Nadirashvili to 41 months' imprisonment; Chvelidze to 34 months' imprisonment; Vorobeychik to 33 months' imprisonment; Kharabadze to 108 months' imprisonment; Spies to 240 months' imprisonment; and Solomonyan to 264 months' imprisonment. In calculating Solomonyan's base offense level, the court found by a preponderance of the evidence that two

8

offense level increases applied pursuant to Section 2K2.1(b) of the Federal Sentencing Guidelines: a 15-point increase for a conspiracy involving a destructive device, and a 10-point increase for a conspiracy involving at least 200 firearms.

DISCUSSION

Appellants raise a variety of issues on appeal. We expressly address only three of these arguments.

a) <u>Sufficiency of the Evidence as to Domestic Firearms Trafficking</u>

Appellants Nadirashvili, Chvelidze, and Vorobeychik challenge the sufficiency of the evidence underlying their convictions for aiding and abetting domestic firearms trafficking in violation of 18 U.S.C. § 922(a)(2)(A). Vorobeychik argues that although he put Solomonyan in touch with McQueen, through whom Solomonyan ultimately obtained three firearms, he did not knowingly assist in firearms trafficking because he did not know why Solomonyan wanted an introduction to McQueen. Nadirashvili and Chvelidze both argue that although they knew Solomonyan was trying to engage in one specific weapons transaction, they were unaware that he was engaged in a business of dealing in firearms as required under the statute. They also argue that the evidence did not demonstrate their intent to assist Solomonyan in obtaining weapons. Solomonyan and Spies join in the sufficiency challenges without making individualized arguments.

1) Firearms Trafficking Under 18 U.S.C. § 922(a)(1)(A)

9

Section 922(a)(1)(A) makes it illegal for "any person . . . except a . . . licensed dealer, to engage in the business of . . . dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce."  A person is "engaged in the business" of dealing in firearms when he "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."  18 U.S.C. § 921(a)(21)(C).  We have held that:

> [t]he government need not prove that dealing in firearms was the defendant's primary business.  Nor is there a 'magic number' of sales that need be specifically proven.  Rather, the statute reaches those who hold themselves out as a source of firearms.  Consequently, the government need only prove that the defendant has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers.

United States v. Carter, 801 F.2d 78, 81-82 (2d Cir. 1986) (internal quotation marks and citations omitted).

    2) Application

    "Although we review a claim of insufficient evidence de

10

*novo*, a defendant challenging his verdict on sufficiency grounds bears a heavy burden.  We must uphold the jury's verdict if we find that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Hardwick, 523 F.3d 94, 100 (2d Cir. 2008) (internal quotation marks and alteration omitted) (emphasis in original).  We "view the evidence, whether direct or circumstantial, in the light most favorable to the government" and "may not substitute our own determinations of credibility or relative weight of the evidence for that of the jury."  Id. (internal quotation marks omitted).

The sufficiency challenges brought by Solomonyan and Spies may be quickly resolved.  There was evidence that they not only corresponded with each other, as well as with numerous contacts, in their attempts to obtain firearms for Davis, but also succeeded in procuring eight guns.  This evidence was easily sufficient for the jury to find beyond a reasonable doubt that Solomonyan and Spies violated Section 922(a)(1)(A) by unlawfully engaging in the business of dealing in firearms.

Vorobeychik's challenge is also unfounded.  Although he claims to have been in the dark as to Solomonyan's true intentions, the government presented ample evidence to allow the jury to conclude that Vorobeychik knowingly aided and abetted Solomonyan in engaging in a business of dealing in firearms. Transcripts of recorded telephone conversations reveal that

11

Vorobeychik put Solomonyan in touch with McQueen after reassuring Solomonyan that McQueen had been warned not to "be afraid of what [Solomonyan's] going to talk to [him] about." Just a few minutes later, Solomonyan told McQueen that he wanted "[t]rucks with fully automatic transmission or small sport's [sic] cars but still with fully automatic transmissions" and clarified that "of course I am not talking about vehicles." Vorobeychik called Solomonyan two weeks later to ask whether McQueen could "really get it," to which Solomonyan replied, "I only need two pieces." The following month, Vorobeychik and Solomonyan discussed a plan to make "large income" by working directly with McQueen. Within one month of this conversation, Solomonyan obtained three firearms from McQueen. Viewing this evidence in its totality, there were ample grounds for the jury to conclude that Vorobeychik knowingly assisted Solomonyan in his firearms trafficking scheme. The jury was certainly not bound as a matter of law to believe that Vorobeychik and Solomonyan were talking about two completely different things over the course of time. The evidence was, therefore, sufficient to support Vorobeychik's conviction.

The evidence against Nadirashvili and Chvelidze was sufficient to support their convictions as well. They argue that, although they were aware Solomonyan was engaged in a single gun transaction, the evidence did not show that they knew he was engaged in the business of trafficking in firearms. The statute

12

does suggest that Nadirashvili and Chvelidze had to know that Solomonyan was engaged in more than just a single sale of weapons, as it defines a person "engaged in the business" of dealing in firearms as one who engages in "repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C) (emphasis added). However, the government's burden under Section 922(a)(1)(A) is to "prove that the defendant 'has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers.'" Carter, 801 F.2d at 82 (quoting United States v. Berry, 644 F.2d 1034, 1037 (5th Cir. 1981)). Thus, the government did not need to prove that Nadirashvili and Chvelidze were aware that Solomonyan was actually engaged in multiple transactions, but rather that they knew Solomonyan had held himself "out as a source of firearms" and was ready to procure them for his customers. Id.

Applying this standard, there was sufficient evidence for the jury to find that Nadirashvili and Chvelidze aided and abetted Solomonyan in engaging in the business of dealing in firearms. In their first recorded conversation, Solomonyan told Nadirashvili that he had already received money from a customer in exchange for his promise to deliver automatic weapons. Moreover, Solomonyan explained to Nadirashvili that he had been negotiating with a dealer and needed Nadirashvili's help only because the dealer disappeared at the last minute. Nadirashvili

13

immediately relayed all the pertinent information to Chvelidze, who said he could fill the order within several days, and invited Nadirashvili to "place an order."  Nadirashvili and Chvelidze each told Solomonyan directly that they would try to procure firearms for him.  Perhaps not every rational trier of fact would conclude that Nadirashvili and Chvelidze knew Solomonyan was engaged in anything more than a one-time transaction.  However, the applicable standard of review requires only that "<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Hardwick</u>, 523 F.3d at 100 (emphasis in original).  Solomonyan's statements to Nadirashvili and Chvelidze demonstrated a familiarity with firearms and a fluency in the coded language used to discuss them over the phone.  Solomonyan also suggested that he had contacts with a dealer who actually had firearms in his possession.  It would not be unreasonable for a trier of fact to infer from these facts that Nadirashvili and Chvelidze knew Solomonyan was not simply filling a one-time order but was in fact holding himself out more generally as a source of firearms.  We therefore affirm their convictions.

b) <u>As-Applied Vagueness Challenge to 22 U.S.C. §</u>
<u>2778(b)(1)(A)(ii)</u>

Kharabadze was convicted under Section 2778(b)(1)(A)(ii) of conspiring to broker in foreign defense articles and aiding and abetting Solomonyan and Spies in their commission of the

14

substantive brokering offense.  Section 2778(b)(1)(A)(ii) makes it illegal to "engage[] in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article."  The regulations define "broker" as "any person who acts as an agent for others in negotiating or arranging contracts, purchases, sales or transfers of defense articles or defense services in return for a fee, commission, or other consideration."  22 C.F.R. § 129.2(a).  "Brokering activities" are defined to include "the financing, transportation, freight forwarding, or taking of any other action that facilitates the manufacture, export, or import [of] a defense article."  Id. § 129.2(b).  The regulations also specify that "engaging in the business of brokering activities requires only one action as described above."  Id.

Kharabadze contends that his conviction should be vacated because the phrase "the business of brokering activities" is unconstitutionally vague as applied to him.  Specifically, he claims that the word "facilitates" is ambiguous and argues that he could not have known that "merely . . . providing information about the availability and prices of foreign defense articles" fell within the statute.  Kharabadze Br. at 28 (emphasis omitted).

"'[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited

15

and in a manner that does not encourage arbitrary and discriminatory enforcement.'" United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)). In an as-applied challenge, "one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993). Regardless of whether there is ambiguity at the outer reaches of Section 2778, Kharabadze's conduct falls clearly within its intended scope. He provided Solomonyan with a list of estimated prices based on his knowledge of the Russian market for military weapons, knowing that Solomonyan needed the price list in order to negotiate with purchasers who wanted to see "something real" or at least "approximately real." Applying the usual meaning of the word, this conduct unquestionably "facilitate[d]" Solomonyan's import of defense articles. We therefore reject Kharabadze's constitutional challenge to his conviction under Section 2778.

c) Offense Level Enhancements Under Section 2K2.1(b) of the Sentencing Guidelines

Solomonyan argues that the district court's imposition of two offense level increases -- one for conspiracy involving more than 200 weapons pursuant to U.S.S.G. § 2K2.1(b)(1)(E) and the other for conspiracy involving a destructive device pursuant to U.S.S.G. § 2K2.1(b)(3)(A) -- was erroneous because the court found the requisite facts only by a preponderance of the evidence

16

rather than with reasonable certainty. We agree.

Section 2X1.1(a) of the Federal Sentencing Guidelines states that where a conspiracy is not covered by a specific offense guideline, the base offense level is "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established <u>with reasonable certainty</u>." (emphasis added). Consequently, the district court correctly looked to Section 2K2.1(a)(4)(B) to set the base offense level at 20 because the offense involved possession and transport of a machine gun and was committed while Solomonyan was an illegal alien. However, the offense level adjustments listed in Section 2K2.1(b) make no mention of a conspiracy. The district court, therefore, should have reverted to the reasonable certainty standard described in Section 2X1.1(a) when it applied the two offense level increases under Section 2K2.1(b)(1)(E) and (b)(3)(A). <u>See</u> <u>United States v. Savarese</u>, 404 F.3d 651, 655-56 (2d Cir. 2005). We therefore vacate Solomonyan's sentence and remand for the district court to make that determination in the first instance. <u>Id.</u>; <u>see</u> 18 U.S.C. § 3742(f)(1) ("If the court of appeals determines that . . . the sentence was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate."). On remand,

17

the district court is instructed to recalculate Solomonyan's offense level for the conspiracy convictions, applying the reasonable certainty standard to any facts underlying the offense level adjustments listed in Section 2K2.1(b).

## CONCLUSION

For the foregoing reasons, we vacate Solomonyan's sentence and remand to the district court for resentencing in accordance with this opinion.  We have considered all the arguments advanced by appellants that are not expressly discussed in this opinion and find them meritless.  We affirm the remainder of the convictions and sentences.

18